RON SASSER, Plaintiff-Appellant, v. ALFRED BENESCH AND COM-
PANY, Defendant-Appellee (The Illinois State Tollway Authority *et al.*,
Defendants).

First District (3rd Division)   No. 1—89—2402

Opinion filed June 28, 1991.

Fritzshall & Gleson, of Chicago, for appellant.

Hinshaw & Culbertson and Tribler & Orpett, P.C., both of Chicago, for
appellee.

PRESIDING JUSTICE CERDA delivered the opinion of the
court:
Plaintiff, Ron Sasser, appeals from the entry of summary judg-
ment in favor of defendant, Alfred Benesch & Company (Benesch), in
his Structural Work Act (Ill. Rev. Stat. 1989, ch. 48, par. 60 *et seq.*)
(the Act) and negligence action. Plaintiff argues that the trial court

erred in granting summary judgment because a factual issue existed as to whether Benesch was in charge of the work within the meaning of the Act and because a manual's provision that disclaimed Benesch's responsibility for safety at the jobsite was unenforceable.

Plaintiff alleged the following in count I of his complaint against defendants Benesch, Illinois State Tollway Authority (ISTA), and Chicago & North Western Transportation Railroad Company (C&NW). On or before November 2, 1987, defendants owned and/or were in charge of the erection, construction, repairs, alteration, removal, and/ or painting of a structure located at Crescent Boulevard Bridge in the Village of Lombard. Defendants participated in coordinating the work, designated various work methods, maintained and checked work progress, participated in the scheduling and the inspection of the work, and had the authority to stop the work. Plaintiff, who worked on the site as an employee of Walsh Construction Company, was injured as a result of a fall in the mud while carrying a concrete form. Defendants violated the Act by failing to place and operate a crane, material hoist, or other mechanical contrivance in a safe manner to transport the concrete form and to provide adequate protection for plaintiff.

Plaintiff alleged in count II that defendants were negligent.

Benesch's answer admitted that it had employees on the construction site "at certain times" during the course of construction.

Benesch filed a motion for summary judgment in which it argued that it was a structural engineering firm retained by ISTA to observe the construction site for compliance with the plans and specifications, that it did not have the authority to direct the manner in which the work was done, and that it therefore was not liable under the Act, which required that a defendant had charge of the work.

Attached to the motion was a copy of the February 25, 1987, agreement between ISTA and Benesch covering construction inspection engineering services for roadway and bridge construction on the North-South Tollway. The work was to be performed according to the "Construction Section Engineer's Manual, January 1987" (the manual). Benesch agreed that

> "[it was] responsible for any and all injuries to persons and damages to property due to the activities of *** [Benesch], its associates, agents or employees, in connection with such services."

The affidavit of John Marks was filed in support of the motion for summary judgment. He swore that: (1) he was Benesch's project manager; (2) he was familiar with the services performed by Benesch for

the project at issue; (3) Benesch's representatives were on the site merely to observe for compliance with the plans and specifications; (4) no Benesch representative had authority to stop the work, issue change orders, or conduct progress meetings on the construction project; and (5) Benesch did not have authority to direct the manner in which plaintiff's work should have been done, did not direct any of the work being done on the site, and did not supply, provide, repair, or direct the use of any equipment used in the construction.

Plaintiff filed as an exhibit to his response to the motion a copy of the manual which stated that it was to be part of the proposal and agreement for construction section engineer services. The manual defined "construction section engineer" as the engineer engaged by ISTA to observe the work to determine whether or not it was being performed and constructed in compliance with the contract. This definition was qualified by the statement:

"This does not in any way or sense mean that the Engineer, Section Engineer, or the Inspector is a guarantor of the Contractor's work, is responsible for safety in, on, or about the job site, is in control of the safety or adequacy of any equipment, construction component, forms, scaffolding, falsework or other work aids, or is responsible for supervising The Work."

The manual provided that the construction section engineer was to provide an organization of engineers and inspectors "to verify the completion of the constructed work in accordance with the Contract and which will assure that the Authority [ISTA] will be advised at all times of progress and job conditions." The construction section engineer was to furnish all equipment and materials necessary to perform the on-site testing of materials and the other engineering services. The equipment was to include "[s]afety devices such as hard hats, safety vests, Mars' lights and company vehicle identification signs." As the authorized representative of ISTA, the construction section engineer was to protect ISTA's interest by documenting and certifying that completed work complied with the contract requirements.

Among other duties, the construction section engineer was specifically responsible for: (1) effecting correction of errors, omissions, and oversights found in the plans and specifications; (2) identifying the ramifications of any unforeseen condition or situation arising on the project, establishing priorities for action, and making detailed recommendations to ISTA for such action; (3) monitoring construction progress with notification to ISTA of deviations from the schedule; (4) actively monitoring the safe and efficient movement of traffic through construction zones; (5) advising the contractor of conflicts with the

contract plans; (6) anticipating, determining, and documenting the necessity for any field changes; (7) documenting all occurrences and proceedings relevant to the administration of the contract; and (8) recommending improvements to ISTA to aid the development of future projects.

The manual also provided that the construction section engineer had the authority to: (1) enforce plans and other contract requirements; (2) reject work that was of unacceptable quality or otherwise failed to meet the contract requirements; (3) notify the contractor to stop work in progress when continuation was likely to result in an unacceptable element of construction which would be difficult to correct; (4) direct contractor attention to those areas where effective coordination was necessary to achieve acceptable results but no responsibility or authority to direct the contractor's operations or coordinate contractor activities; (5) recommend disbursal of payments to the contractor; (6) recommend approval of equipment, materials, and mix designs proposed by the contractor; (7) initiate and negotiate necessary changes to the contract; (8) notify the contractor to immediately correct any observed deficiencies in the management of traffic through construction zones; (9) approve any revised progress schedule(s) submitted by the contractor; and (10) advise ISTA of any circumstances which could affect the completion date.

The manual further specified that the construction section engineer was to "furnish continuous field inspection of the materials and workmanship at the job site" by, *inter alia*: (1) inspecting the contractor's construction equipment to determine its compliance with the contract and its capability to perform the work; (2) reviewing and making recommendations to ISTA on contractor's requests for approval of subcontractors; (3) inspecting all items of work, as specified in the contract, for compliance with the contract; (4) keeping daily records of the quantities involved; (5) determining the locations from which unsuitable material was to be removed; (6) inspecting and testing soils and all construction materials; (7) performing any field work required to construct items covered by extra work orders; (8) checking all pavement for thickness and surface tolerance as required by the specifications; (9) inspecting utility and railroad work; (10) providing periodic surveillance of maintenance of "Traffic items" to ensure compliance with contract requirements; (11) furnishing all testing equipment and supplies as listed in the manual and deemed necessary to perform the required testing; and (12) certifying the calibration of all equipment the contractor used that directly affected the quantity of a "respective pay item."

The engineer was to keep a project diary containing a daily record of "all significant items relating to the project." Notes were to be complete because of possible importance "in the decision of claims or the establishment of responsibilities for liabilities." Items that were to be noted included the weather, directions given to the contractor, important discussions with the contractor, and the arrival and departure of major equipment.

John Marks, a Benesch civil engineer who became the project manager with staff supervisory responsibility, testified at his deposition to the following. Benesch wanted to have a representative on the site to observe the contractor's work. There were an average of six to eight Benesch personnel at the site each day. Marks worked about 40 hours a week and normally from 7 a.m. to 3 p.m., but on some days he worked 10 or more hours. Benesch would bring to the contractor's attention a condition that may not have met specifications (*e.g.*, traffic lights had to be set a certain distance apart) and would ask the contractor to review it with the subcontractor. Benesch had no authority to alter the work and had the authority to stop work only if it did not comply with the specifications. But Benesch also could stop work because of the weather, *e.g.*, if rain affected the finish of concrete. Marks did not believe that it was Benesch's function to note dangerous occurrences.

The trial court granted Benesch's motion for summary judgment and orally ruled that: (1) Benesch was not in charge of the work; (2) the "real authority" was retained by ISTA; and (3) the agreement provided that Benesch did not have responsibility for safety of the jobsite. The order stated that there was no just cause to delay enforcement or appeal.

Plaintiff argues that the trial court erred in granting Benesch's motion for summary judgment because there was a factual question regarding Benesch's control over plaintiff's work. Plaintiff notes Benesch's numerous duties that were delineated by the contracts. Benesch argues that it was not in charge of the work, its duties were limited to assuring ISTA that the work complied with the plans and specifications, it did not direct the work of plaintiff or of any other workers, and it did not have the authority to stop the work, to conduct progress meetings, or to issue change orders.

Section 9 of the Structural Work Act provides in part:

"Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this Act, shall com-

ply with all the terms thereof \*\*\*." (Ill. Rev. Stat. 1989, ch. 48, par. 69.)

Among the Act's requirements is that scaffolds and hoists be erected or constructed in a manner that is safe and gives proper protection to persons on them. Ill. Rev. Stat. 1989, ch. 48, par. 60.

■ Factors that have been used in determining whether one was in charge of the work within the meaning of the Act are: (1) supervision and control of the work or retention of the right to supervise and control the work; (2) constant participation in ongoing activities at the site; (3) supervision and coordination of the subcontractors; (4) responsibility for safety precautions at the site; (5) authority to issue change orders; (6) authority to stop work; (7) ownership of equipment used at the site; (8) familiarity with construction practices; and (9) ability to correct unsafe or improper work habits and equipment deficiencies. (*Gentile v. Kehe* (1987), 165 Ill. App. 3d 802, 805-06, 520 N.E.2d 827.) It is unnecessary that a defendant be in direct charge of the particular operation from which the injury arose if it was in charge of the overall work for the project. *Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 186, 498 N.E.2d 522.

An architect who had the authority to stop the work if necessary for the proper performance of the contract was found in charge within the meaning of the Act in *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 122-23, 373 N.E.2d 1348, and an engineer who had the authority to suspend work, change the plans, and remove careless workers was found to have been in charge in *Kirk v. Walter E. Deuchler Associates, Inc.* (1979), 79 Ill. App. 3d 416, 419-20, 398 N.E.2d 603. The authority of an owner's engineers to stop work that was being performed unsafely was the basis for finding an owner in charge in *Kjellesvik v. Commonwealth Edison Co.* (1979), 73 Ill. App. 3d 773, 777, 392 N.E.2d 116. An owner's authority to do more than to ensure that contractual plans were met, including the ordering of work to be redone, was the basis for reversing a directed verdict entered in his favor in *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 491, 394 N.E.2d 403. Directed verdicts have also been rejected where an architect had the right to insist upon a safe method of shoring and to stop work performed in an unsafe manner (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 284-86, 226 N.E.2d 630), and where an engineer had the authority to remove workers and to suspend work (*Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 527, 328 N.E.2d 297).

■ In addition to merely observing the work in progress to ensure that all work was in compliance, Benesch had the authority to

inspect work, to administer the contract, to document all activities, to prepare all required documents, to conduct all materials testing, to identify and determine the ramifications of any unforeseen conditions, to monitor the movement of traffic, to determine the necessity for any field changes, to reject unacceptable work, to stop the contractor's work if the result would be unacceptable and difficult to correct, to direct the contractor's attention to areas needing effective coordination, to initiate necessary changes to the contract, to notify the contractor to correct deficiencies in the management of traffic, to approve any revised progress schedules submitted by the contractor, to review all contractor correspondence which was to be addressed to Benesch, to keep a daily project diary, and to furnish all testing equipment. An average of six to eight of Benesch's personnel were present at the construction site each workday.

These facts demonstrate the direct connection that Benesch had with the construction on an ongoing basis. Although Benesch did not have direct control over the construction methods, it did have the right to stop certain work. There is a factual issue as to whether it was in charge within the meaning of the Act. (See *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 101-02, 338 N.E.2d 868 (owner was in charge even without control of construction activities where it had some participation in the ongoing construction activity); *Voss*, 60 Ill. 2d at 527 (reversal of directed verdict in favor of defendant based at least partially on fact that engineer had the authority to suspend work because of unfavorable conditions); *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 123-24, 373 N.E.2d 1348 (verdict upheld against architect who had the authority to require the contractor to stop the work if necessary for the proper performance of the contract).) Benesch's right to stop work if the result would be unacceptable and difficult to correct is a fact which distinguishes the cases in which architects or engineers were determined not to have been in charge. (See *McGovern v. Standish* (1976), 65 Ill. 2d 54, 69, 357 N.E.2d 1134 (architect's function was limited to general overseeing); *Fruzyna v. Walter C. Carlson Associates, Inc.* (1979), 78 Ill. App. 3d 1050, 1059, 398 N.E.2d 60 (the architect did not have the authority to stop the work and had no continuous supervision duties); *Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 1138, 1141-44, 401 N.E.2d 1287 (architect did not have the authority to stop the work because of hazardous conditions and was to make only periodic visits to the site).) It was error for the trial court to find as a matter of law that Benesch was not in charge of the construction.

■ Plaintiff also argues that the manual's provision stating that the engineer was not responsible for safety at the jobsite was void under "An Act in relation to indemnity in certain contracts" (Ill. Rev. Stat. 1989, ch. 29, par. 61). Benesch argues that the issue of the provision's voidness was waived because it was not raised in the trial court (*Carter v. Dunlop* (1985), 138 Ill. App. 3d 58, 60, 484 N.E.2d 1273), and plaintiff responds that the issue was raised in the trial court by Benesch's reply brief in support of the motion for summary judgment. We hold that the issue of voidness was waived because it was not raised by either party in the trial court; Benesch's reply brief merely cited the provision and no argument was made about statutory applicability. Plaintiff also argues that *Carter* (138 Ill. App. 3d at 60) only held that the rationale for the waiver rule is that different theories or new questions should not be considered on appeal because proof might have been offered to refute them and that the rule does not apply here because the legal issue did not lend itself to proof. But legal issues that do not require consideration of evidence are also waived if not presented to the trial court. See *Harbor Insurance Co. v. Arthur Andersen & Co.* (1986), 149 Ill. App. 3d 235, 240, 500 N.E.2d 787 (an issue concerning the construction of insurance policies waived on appeal from summary judgment).

Benesch argues that the trial court properly entered summary judgment in its favor on the negligence count even though plaintiff did not raise the issue. Plaintiff asserts only in his reply brief that summary judgment should not have been entered on the negligence count. Issues raised for the first time in the reply brief are waived. (*Continental Illinois National Bank & Trust Co. v. Spiegel* (1987), 154 Ill. App. 3d 450, 452-53, 507 N.E.2d 58.) Summary judgment on the negligence count shall stand.

The judgment of the trial court is reversed, and the cause is remanded.

Reversed and remanded.

RIZZI and WHITE, JJ., concur.