GEORGE COCHRAN *et al.*, Plaintiffs-Appellants, v. GEORGE SOLLITT CONSTRUCTION COMPANY, Defendant-Appellee (Loyola University Medical Center, Defendant).

First District (1st Division)   No. 1—04—2616

Opinion filed June 30, 2005.

David J. Kupets and Jason M. Kleinman, both of Law Offices of Kupets & DeCaro, P.C., of Chicago, for appellants.

Philip W. Domagalski and William E. Spizzirri, both of Kralovec & Marquard, Chtrd., of Chicago, for appellee.

JUSTICE JOSEPH GORDON delivered the opinion of the court:
George Cochran and his wife brought this negligence action against George Sollitt Construction Co. (Sollitt) and Loyola University Medical Center (Loyola Hospital),[1] seeking damages for injuries sustained on the job by Cochran, a sheet metal worker, and for his wife's loss of consortium. The circuit court granted Sollitt's motion for summary judgment. For the reasons that follow, we affirm.

## BACKGROUND

The allegations of the complaint are as follows. On or about October 5, 2000, the day of the incident, Sollitt was a general contractor on a construction project at Loyola Hospital. Cochran was an employee of James H. Anderson (Anderson), one of Sollitt's subcontractors. Cochran was performing construction work on an old air duct in the sub-basement level of Loyola Hospital. While performing the work, he stood on a ladder which had been placed on a piece of plywood that itself was set on top of two milk crates. At one point, the ladder shifted to the edge of the plywood, causing it to tip. As a result, Cochran fell to the floor, sustaining injuries. Cochran alleged negligence on Sollitt's part in that Sollitt: failed to provide him with a safe place to work; failed to provide "a safe, suitable, and proper support for [his] protection"; and failed to properly "manage[ ], maintain[ ] or control[ ] the premises and the support equipment used thereon."

Cochran testified in his deposition that the incident occurred on his first day on the job. When he reported for work at approximately 6 a.m. to the "old fan room" located in the hospital's sub-basement, Anderson's foreman, Bill Wesselhoff, gave him instructions to demol-

[1]Loyola Hospital was dismissed as defendant in this action and is not party to this appeal.

ish the old ductwork from the ceiling of the "old fan room." The "old fan room" had an overall dimension of 20 feet by 20 feet, was rectangular in shape and consisted of two separate areas. The two areas were referred to as compartment 1 and compartment 2. Cochran was to first work in compartment 2. To access compartment 2, Cochran walked through compartment 1. At that time, no ladders were set up in compartment 1. As Cochran was working in compartment 2, Wesselhoff was setting up ladders in compartment 1.[2] After Cochran had worked in compartment 2 for about half an hour, Wesselhoff directed him to work in compartment 1. When Cochran entered compartment 1, he saw an Anderson-owned ladder set up atop a four-foot by eight-foot piece of plywood. Compartment 1 was so poorly lit that Cochran would not have been able to see his feet. He was unaware that the plywood had been placed atop two milk crates set in a drainage pit that covered a greater portion of the room. After receiving instructions from Wesselhoff, which took approximately 10 minutes, Cochran stepped directly onto the plywood and climbed the ladder. For about 20 minutes, Cochran worked on removing the old ductwork from the ceiling. In order to do so, he had to reach up above his head for the air duct with both hands. As Cochran was bringing down the air duct, the ladder "walked" and he fell. Cochran stated that he did not know who owned or placed the plywood and the milk crates. Prior to the incident, he had not spoken to any Sollitt employees; Sollitt had not instructed him as to how, when or where to do his work; and Sollitt had not provided him with any equipment.

Howard Strong, president of Sollitt, testified in his deposition that Sollitt and Loyola Hospital had entered into a construction contract. The parties used a standard American Institute of Architects' contract form. The contract, which was incorporated by reference in Sollitt's motion for summary judgment, provided, in pertinent part:

"8.2 SUPERVISION AND CONSTRUCTION PROCEDURES

8.2.1 The Contractor [Sollitt] shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over the construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall be fully and solely

---

[2]Cochran stated that he did not know whether anyone else was present in compartment 1 while Wesselhoff was setting up ladders.

responsible for the jobsite safety thereof unless the Contractor gives timely written notice to the Owner and Architect that such means, methods, techniques, sequences or procedures may not be safe.

8.2.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

\* \* \*

15.1 SAFETY PRECAUTIONS AND PROGRAMS

The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract. The Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

.1 employees on the Work and other persons who may be affected thereby."

Strong admitted that Sollitt had "general control" over its subcontractors' work, but denied that Sollitt had "specific control" over the subcontractors, including Anderson. Sollitt's job was primarily to coordinate the work of various subcontractors. Sollitt did not require its construction superintendent to do a daily "walk-through"; however, in the course of his daily duties, the superintendent would observe the progress of the work and the conditions of the site. Should he observe people work in an unsafe manner, he had the authority to stop the work. The primary responsibility for the safety of the subcontractors' personnel and for compliance with all applicable standards and requirements was with the subcontractors. Although the subcontractors were required to conduct safety "toolbox meetings," the topics covered were left to the subcontractors' discretion. The subcontractors controlled their own work and had their own means and methods of doing it.

Paul Ryan, Sollitt's field superintendent, testified in his deposition that although he coordinated the work of various subcontractors, he did not tell the subcontractors, including Anderson, how to perform their work and did not get involved in the specific details of the subcontractors' safety means in the areas of ladder safety and fall protection. The subcontractors provided their own equipment. Sollitt required that every subcontractor have a safety protocol. Ryan made sure that every subcontractor had a copy of its own safety manual on site. At various times throughout the day, Ryan would be walking through the jobsite. While doing so, he was looking for hazards, among other things. In the event he encountered a hazard, Ryan would

instruct that it be corrected. Based on his daily observations of the Anderson crew, he stated that they performed their work in a safe and suitable manner. The day before the incident, Ryan observed the conditions in the "old fan room." The room was adequately lit, and he did not observe any unsafe conditions. Ryan was aware of the existence of the drainage pit, which was approximately 12 inches deep, in compartment 1. He next visited the "old fan room" shortly after the incident and observed a piece of plywood teetering on milk crates. Ryan stated that he knew that Anderson brought some of its supplies to the site in milk crates, and no other subcontractor used those types of crates.

Bradley Gaski, Sollitt's labor foreman for the project, testified in his deposition that his job included giving his fellow Sollitt employees their job assignments for the day, making sure "everything is going smooth[ly]" and "inspecting for safety issues." As far as he knew, no employees or agents of Sollitt instructed Anderson's employees on how to do their work or provided them with any tools or equipment. With respect to the safety of the subcontractors' personnel, Gaski stated that if he saw a safety violation, he would be responsible for stopping the work and correcting the problem. Prior to Cochran's fall, he was unaware of the unsafe ladder setup in the "old fan room."

David Hermsdorfer, Sollitt's carpenter foreman on the project, testified in his deposition that his primary responsibility was for Sollitt's carpenters. In regard to the safety of the subcontractors' employees, his responsibility was to stop the work he observed being done in an unsafe manner and tell the subcontractor to correct the problem. However, Hermsdorfer did not have a responsibility to inspect the subcontractors' ladders or scaffold supports.

Sollitt's subcontractor safety handbook, which is part of the record on appeal, was incorporated into the subcontract agreements. The handbook stated that subcontractors had the primary responsibility for the safety of their personnel and compliance with all local, state and federal standards and requirements. The handbook required each subcontractor to have a competent project safety representative assigned to the project, conduct weekly safety "toolbox" talks, and report all accidents and incidents to Sollitt.

Sollitt's safety manual, which was patterned after and mirrored the Occupational Safety and Health Administration (OSHA) regulations, provided that Sollitt's superintendent and foremen were "competent persons" with the attendant duty to maintain safe work conditions for their crews and safe working practices by all personnel. More specifically, "competent persons" were responsible for enforcing the rules and regulations set forth by the construction contracts, recognizing safety issues or violations, and arranging for periodic

safety inspections. "Competent persons" also had the authority to stop the work being done in an unsafe manner.

■ Sollitt moved for summary judgment, arguing that the language of the construction contract between it and Loyola Hospital was not controlling; rather, the existence of a duty on the part of a general contractor such as itself was governed by the "retained control" theory articulated in section 414 of the Restatement (Second) of Torts (the Restatement). Section 414, which has been adopted in Illinois, provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414, at 387 (1965).

The "retained control" concept is further explained in comment *c* to section 414:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*" (Emphasis added.)
> Restatement (Second) of Torts § 414, Comment *c*, at 388 (1965).

Sollitt thus argued that it owed no duty of care to Anderson's employees because it did not exercise such control over the operative details of Anderson's work that Anderson's employees were not entirely free to perform the work in their own way. In the alternative, Sollitt argued that it could not be held liable under the retained control theory because it did not have actual or constructive notice of the dangerous condition.

■ Cochran, in opposition to Sollitt's motion for summary judgment, stated that "[t]he controlling issue of this case is whether [Sollitt] retained such control over [the subcontractors'] work so as to be reasonably held liable for injuries caused due to the failure to exercise that control with sufficient care." Cochran argued that the case, at the very least, presented a genuine issue of material fact as to whether Sollitt, pursuant to the contract and/or section 414, owed him a duty to provide a safe workplace. Cochran did not raise an issue that Sollitt

owed him a duty of care under the theory of premises liability articulated in section 343 of the Restatement (Restatement (Second) of Torts § 343, at 215-16 (1965)),[3] which has also been adopted in Illinois and applied in cases where a construction worker was injured on the jobsite. Nor was section 343 raised in Sollitt's reply.

The circuit court granted Sollitt's motion for summary judgment. The court found that the evidence tendered did not show that Sollitt controlled "the operative details, the incidental aspects or the means and methods of [Cochran's] work" and, consequently, did not owe Cochran a duty of care predicated on the retained control theory of section 414 of the Restatement. The circuit court, in the alternative, found that there was no evidence that Sollitt had actual or constructive notice of the condition complained of. This appeal followed.

## ANALYSIS

Summary judgment is appropriate where the pleadings, depositions, admissions and affidavits on file, viewed in light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002); *Sollami v. Eaton*, 201 Ill. 2d 1, 6-7, 772 N.E.2d 215, 218 (2002). We review a grant of summary judgment *de novo*. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 462, 786 N.E.2d 1010, 1014 (2003).

On appeal, Cochran contends that Sollitt owed him a duty of care under two alternative theories: (1) the retained control theory with the reference to section 414 of the Restatement and the contract between Sollitt and Loyola Hospital; and (2) the premises liability theory of section 343 of the Restatement.

### The Premises Liability Theory

■ Sollitt argues that Cochran waived the premises liability theory for review because he did not raise it in his response to Sollitt's motion for summary judgment. "It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the

---

[3]Section 343 provides:
  "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
    (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
    (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
    (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343, at 215-16 (1965).

first time on appeal." *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536, 662 N.E.2d 1248, 1253 (1996). Cochran, however, argues that it is sufficient that he raised the premises liability theory in his complaint by alleging that Sollitt was negligent in managing, maintaining and controlling the premises and in providing him with a safe place to work. We disagree with Cochran. See *E&E Hauling, Inc. v. Ryan*, 306 Ill. App. 3d 131, 140, 713 N.E.2d 178, 185 (1999) (issues not raised during summary judgment proceedings are waived); *Sasser v. Alfred Benesch & Co.*, 216 Ill. App. 3d 445, 452, 576 N.E.2d 303, 308 (1991) (theories not argued during summary judgment proceedings are waived). Waiver aside, Cochran's premises liability argument would, in any event, fail because no evidence was presented that Sollitt knew or should have known of the unsafe ladder setup in the "old fan room." See Restatement (Second) of Torts § 343, at 215-16 (1965) (no liability may be imposed in the absence of actual or constructive knowledge of the unsafe condition). As shall be further discussed below, by Cochran's own admission, the unsafe ladder setup existed for an hour at the most (for less than half an hour while Cochran was working in compartment 2 and Wesselhoff was setting up the ladder in compartment 1, and then for approximately half an hour during which Cochran received instructions and performed work in compartment 1). No one disputes that the unsafe setup was in a relatively remote location in the sub-basement of the hospital. No evidence was presented that any of Sollitt's "competent persons" had observed the unsafe setup. Accordingly, no genuine issue of material fact as to Sollitt's lack of knowledge exists here.

## The Retained Control Theory

Sollitt's lack of knowledge of the unsafe ladder setup is also dispositive of Cochran's remaining theories of recovery. As noted, each of Cochran's theories of recovery is grounded in common-law negligence. The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226 (1990). Generally, a duty of care arises where the parties stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Ward*, 136 Ill. 2d at 140, 554 N.E.2d at 226. Section 414, which has long been recognized as an expression of law in Illinois (see *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325, 211 N.E.2d 247, 252-53 (1965)), articulates the duty of those who employ independent contractors. It provides a "retained control"

exception to the general rule that an employer of an independent contractor is not liable for the independent contractor's acts or omissions. *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill. 2d 19, 21, 276 N.E.2d 336, 338 (1971).

■ As comment *a* to section 414 explains, this section imposes the degree of duty which corresponds to the level of control retained by the employer of the independent contractor:

> "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts § 414, Comment *a*, at 387 (1965).

As noted, Cochran complains of Sollitt's failure to correct the unsafe ladder setup in the "old fan room" or to cause Anderson to do so. In essence, as shall be discussed, this theory of recovery is twofold. As comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care.

Cochran relies on the Fourth District's decision in *Moss v. Rowe Construction*, 344 Ill. App. 3d 772, 801 N.E.2d 612 (2003), which is on point. The contract in *Moss* between the Illinois Department of Transportation and the general contractor provided, in pertinent part:

> " 'Article VIII. Safety: Accident Prevention:
> 1. In the performance of this contract the contractor shall comply with all applicable [f]ederal, [s]tate, and local laws governing safety, health, and sanitation (23 CFR [§] 635). The contractor shall provide all safeguards, safety devices[,] and protective equipment and take any other needed actions as it determines, or as the SHA [State Highway Agency] contracting officer may determine to be reasonably necessary to protect the life and health of employees on the job and the safety of the

public and to protect property in connection with the performance of the work covered by the contract.

2. It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to this contract, that the contractor and any subcontractor shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous[,] or dangerous to his/her health or safety, as determined under construction safety and health standards (29 CFR [§] 1926) promulgated by the Secretary of Labor, in accordance with section 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. [§] 333).'

\*\*\*

'The contractor shall furnish (a) a competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work) \*\*\*.' " *Moss*, 344 Ill. App. 3d at 774, 801 N.E.2d at 613.

These provisions were incorporated into the subcontract agreement between the general contractor and the employer of the plaintiff's decedent. *Moss*, 344 Ill. App. 3d at 774, 801 N.E.2d at 613. The court in *Moss*, although acknowledging that section 414 of the Restatement applied, held that "[i]n this case, the retention of the duty to control safety is answered directly by the contracts." *Moss*, 344 Ill. App. 3d at 776, 801 N.E.2d at 614-15. The court began by framing the central issue of retained control not in terms of who had "control of the 'means and methods' of performing the task, but rather who contractually and/or physically [had] the duty to control [the] safety of the project." *Moss*, 344 Ill. App. 3d at 777, 801 N.E.2d at 615. The court reasoned that it could not ignore the language of the contract—"[t]o do so, \*\*\* would make the contractual obligations for safety a meaningless nullity." *Moss*, 344 Ill. App. 3d at 777, 801 N.E.2d at 615. The court further stated that "[r]egardless of whether language of a contract originates from governmental regulations or is specifically written for an individualized transaction, it may create a duty that is owed to a third party. Restatement (Second) of Contracts § 304, Comment *b*, at 448 (1981)." *Moss*, 344 Ill. App. 3d at 780, 801 N.E.2d at 617. The court, thus, articulated the following test:

"First, the contractual language must be reviewed to determine what terms address the duty to control safety. The facts must then be reviewed to determine whether the duty was physically fulfilled under the contract." *Moss*, 344 Ill. App. 3d at 777, 801 N.E.2d at 615.

Ultimately, the court, relying on the language of the contract, decided that summary judgment for the general contractor was inappropriate because genuine issues of material fact remained "as to whether the contract placed a duty to control safety on defendant and whether defendant physically exercised or failed to exercise that duty." *Moss*, 344 Ill. App. 3d at 784, 801 N.E.2d at 621.

Sollitt argues that the *Moss* analysis is legally flawed and asserts that the First District has already rejected it in our recent decision in *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 807 N.E.2d 480 (2004). In *Martens*, this court disagreed with *Moss* that the central issue is whether the defendant had undertaken the task of controlling the safety of the project. Rather, *Martens* stated:

> "The central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational, or some mix thereof. The party who retains control is the logical party upon whom to impose a duty to ensure worker safety. Penalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety. A party who retains some control over the safety of the work has a duty to exercise that control with ordinary care. Illinois Pattern Jury Instructions, Civil, No. 55.02 (Supp. 2003). Nevertheless, the existence of a safety program, safety manual or safety director does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception. See *Moss*, 344 Ill. App. 3d at 784 (Cook, J., specially concurring). We recognize, of course, that if a defendant's safety program sufficiently affected a contractor's means and methods of doing its work, then such program could bring the defendant within the ambit of the retained control exception. See *Moss*, 344 Ill. App. 3d at 775-76 (defendant was subject to section 414 liability where improperly placed equipment contributed to the worker's injury, contract terms limited the independent contractor's options regarding the placement of equipment, and defendant retained substantial contractual control of safety)." *Martens*, 347 Ill. App. 3d at 318-19, 807 N.E.2d at 492.[4]

In our view, *Martens* and *Moss* focus on different facets of section 414. As noted, comment *a* to section 414 explains that the general

---

[4] A similar position, albeit not as articulately stated, was expressed in *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 794 N.E.2d 937 (2003), *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 776 N.E.2d 774 (2002), and *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 719 N.E.2d 174 (1999).

contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care. *Martens* spoke in terms of "retained control of the independent contractor's work" and whether "[the] defendant's safety program sufficiently affected a [sub]contractor's means and methods of doing its work." *Martens*, 347 Ill. App. 3d at 318, 807 N.E.2d at 492. *Moss*, however, was decided on the theory of direct liability for failing to exercise what the court termed a "specific mandate for safety contained in the contracts." *Moss*, 344 Ill. App. 3d at 783, 801 N.E.2d at 620 ("In the face of this contractual duty to control safety, the trial court erred in considering only whether the general contractor retained control over the means and methods over the performance of the [subcontractor's] job \*\*\*. The law requires the trial court to review the contractual language regarding the general contractor's duty to maintain safety of workers"). Taken together, the two cases illustrate the full reach of section 414.

Cochran relies on the First District's decisions in *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 728 N.E.2d 726 (2000), *Claudy v. City of Sycamore*, 170 Ill. App. 3d 990, 524 N.E.2d 994 (1988), and the early decisions in *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 302 N.E.2d 642 (1973), and *Weber v. Northern Illinois Gas Co.*, 10 Ill. App. 3d 625, 295 N.E.2d 41 (1973), for the proposition that Sollitt owed him a duty of care by virtue of its retained control. Sollitt argues that all of these cases are factually distinguishable from the instant case. We agree with Sollitt.

■ Here, the record shows that, unlike the general contractor in *Bokodi*, Sollitt did not employ a full-time safety manager, did not conduct safety meetings for its subcontractors, did not require its superintendent to do a daily "walk-through," did not get involved in the specific details of the subcontractors' safety means, did not actively inspect for safety violations, and only empowered its "competent persons," as opposed to all of its employees, to halt the subcontractors' work upon observing safety violations. In *Claudy*, unlike here, the trial judge noted that the matter was not " 'one hundred percent free from doubt,' " and there was testimony that the defendant exercised control over the plaintiff's employer. *Claudy*, 170 Ill. App. 3d at 998, 524 N.E.2d at 999.

In *Pasko* and *Weber*, however, there is some analytical language that, if taken literally, would seem to broadly construe what it means to have retained control over the subcontractor's work. In both cases, the defendant's inspector was present daily at the construction site

and there was strong evidence that he knew of the unsafe condition. *Pasko*, 14 Ill. App. 3d at 489, 302 N.E.2d at 649; *Weber*, 10 Ill. App. 3d at 634, 295 N.E.2d at 46. *Weber* had stated:

"We conclude that a factfinder could determine that [the employer of the subcontractor] met the standards of control expressed in the comments [to section 414]. It did retain the power to forbid the work being done in a manner dangerous to others. It did fail to prevent the subcontractor from doing the details of the work in a dangerous manner when it knew it was so being done. It had more power than to make only suggestions or recommendations, and it did retain such a right of supervision that the subcontractor was not entirely free to do the work in his own way." *Weber*, 10 Ill. App. 3d at 639, 295 N.E.2d at 50.

*Pasko* had similarly stated:

"Before an employer can be subjected to liability under this rule there must be such a retention of a right to supervise that the contractor is not entirely free to do the work in his own way. The power to forbid work from being done in a manner likely to be dangerous to himself or others is given as an illustration of the type of power retained by an employer which could subject him to liability." *Pasko*, 14 Ill. App. 3d at 488, 302 N.E.2d at 648.

Neither *Pasko* nor *Weber* draws a clear distinction between direct liability and vicarious liability. As such, they do not delineate in sharp focus the distinction between the two drawn by comment *a* to section 414. To the extent that *Pasko* and *Weber* may suggest a liberal standard as to the degree of control sufficient to impose derivative liability, they have been superceded by our more recent decisions. See *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 794 N.E.2d 937 (2003) (the general contractor's contractual undertaking to supervise and direct the work; be responsible for and control the construction means, methods, techniques, sequences and procedures for coordinating all portions of the work; be responsible for initiating, maintaining and supervising all safety precautions and programs; and to employ a superintendent whose duties included prevention of accidents—did not indicate control over the manner in which the employee of the subcontractor performed his work); *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 776 N.E.2d 774 (2002) (the general contractor's reservation of a general right over the work—the right to start, stop and inspect the progress—was not sufficient to impose vicarious liability where the control over the manner of the work of the subcontractor's employees was exercised only by the subcontractor); *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 719 N.E.2d 174 (1999) (the general contractor's retention of the right to inspect the work done, order changes to the specifications and plans,

and ensure that safety precautions were observed and the work was done in a safe manner did not show that the general contractor retained control over the means of the independent contractor's work).

In the instant case, like in *Shaughnessy, Kotecki* and *Rangel*, there is no basis for vicarious liability because no evidence was presented that Sollitt so controlled the operative details of Anderson's work that Anderson's employees were not entirely free to perform the work in their own way.

However, while in light of *Shaughnessy, Kotecki* and *Rangel* the holdings in *Pasko* and *Weber* are not sustainable under the theory of derivative liability, these holdings are sustainable under the theory of direct liability under comments *a* and *b* to section 414. In both *Pasko* and *Weber* there was strong evidence that the defendant's inspector knew of the unsafe conditions or the inadequate equipment, respectively, and took no steps to stop the work or otherwise remedy the situation. See *Pasko*, 14 Ill. App. 3d at 489, 302 N.E.2d at 649; *Weber*, 10 Ill. App. 3d at 634, 295 N.E.2d at 46. As shall be more fully discussed below, such knowledge would provide a sufficient basis for the imposition of direct liability for failure to exercise the general supervisory control with reasonable care.

Here, there can be no genuine issue of material fact that Sollitt's state of knowledge and degree of control were insufficient to support a finding of liability under the theory of direct liability; so too, as discussed, there was no such basis from which to infer any derivative liability. In this regard, we again turn to the Restatement. Comment *b* to section 414 provides:

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, *if he knows or by the exercise of reasonable care should know* that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he *knows or should know* that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." (Emphasis added.) Restatement (Second) of Torts § 414, Comment *b*, at 387-88 (1965).

According to comment *b* to section 414, the general contractor's knowledge, actual or constructive, of the unsafe work methods or a

dangerous condition is a precondition to direct liability. Here, as noted, Cochran admitted that the unsafe ladder setup created by Anderson's foreman Wesselhoff was in existence for an hour at the most before his injury, which occurred in a relatively remote location in the sub-basement of the hospital. None of Sollitt's "competent persons" had observed the unsafe setup during that short a time period. As we stated in *Rangel*, no liability lies on such facts:

> "This unsafe method of performing the work, which led to [the plaintiff's] injury, was proposed by [his] employer just hours before the accident. Here, *** there is nothing to suggest that the general contractor 'knew or had notice of the hazardous method employed within this restrictive time period.' " *Rangel*, 307 Ill. App. 3d at 839, 719 N.E.2d at 177, quoting *Bezan v. Chrysler Motors Corp.*, 263 Ill. App. 3d 858, 864, 636 N.E.2d 1079, 1083 (1994).

For the reasons set forth above, we affirm the judgment of the circuit court.

Affirmed.

CAHILL, P.J., and O'MALLEY, J., concur.