In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1985

JOSE A. AGUIRRE and
MARIA L. AGUIRRE,

*Plaintiffs-Appellants,*

*v.*

TURNER CONSTRUCTION COMPANY,
BARTON-MALOW COMPANY, KENNY
CONSTRUCTION COMPANY, and TBMK,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 515—**Suzanne B. Conlon**, *Judge.*

---

ARGUED NOVEMBER 6, 2006—DECIDED SEPTEMBER 7, 2007

---

Before RIPPLE, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Jose Aguirre was injured when he fell from a scaffold while working for a masonry subcontractor on the Soldier Field renovation project in Chicago. Aguirre and his wife brought negligence claims based on section 414 of the *Restatement (Second) of Torts* and res ipsa loquitur against the general contractors in charge of the renovation. Aguirre maintains the defendants owed him a duty of reasonable care based on their extensive oversight of all project safety. The district court granted

summary judgment for the defendants after concluding they had not retained sufficient control over the subcontractor's work to give rise to any duty of care toward Aguirre or supply a basis for liability on a res ipsa loquitur theory. Because we conclude that these holdings are inconsistent with the requirements of Illinois negligence law, we reverse.

## I. Background

Jose Aguirre was injured when he fell from a scaffold while working as a bricklayer on the renovation of Soldier Field in Chicago. Aguirre was an employee of A.L.L. Masonry ("A.L.L."), one of numerous subcontractors working on the renovation project. The project was overseen by the defendants, collectively known as the joint venture TBMK. Aguirre maintains that his fall was the result of design and/or construction defects in the scaffold. He and his wife brought negligence and loss of consortium claims against the defendants based on section 414 of the *Restatement (Second) of Torts*, which permits direct liability against a general contractor who retains sufficient control over a subcontractor, and on res ipsa loquitur, which permits circumstantial evidence of liability against a defendant in control of the instrumentality of the injury. The defendants moved for summary judgment on the ground that they, as the general contractors, owed no duty under either theory to Aguirre, an employee of a subcontractor.

Discovery proceeded to determine the extent of control TBMK retained over A.L.L.'s work. This discovery demonstrated that although the contract between TBMK and A.L.L. stated that A.L.L. remained "solely responsible for the safety of [its] employees," TBMK also played an active part in overseeing the safety of the renovation project. For example, TBMK promulgated an extensive

125-page safety program that all subcontractors were required to follow, and it hired a safety coordinator and other personnel to oversee that program. TBMK also held monthly safety meetings, required subcontractors to hold regular safety meetings that TBMK could monitor, and required subcontractors to prepare their own site-specific safety programs. TBMK personnel walked the work site daily to monitor compliance with these safety requirements. The safety coordinator and his employees had and sometimes exercised the authority to halt any subcontractor work being performed in an unsafe manner.

TBMK's safety program, which is part of its contract with A.L.L., included 23 rules specifically pertaining to the erection of scaffolding. Those rules imposed both design requirements, such as guardrail and plank specifications, and safety precautions, such as regular inspection and fall protection. The district court found that although "TBMK was not required to inspect all of the scaffolding, [it] did do so." The scaffold from which Aguirre fell had been specifically altered from the standard design based on an irregularity in the area where the work was being performed. Although no TBMK employee inspected the scaffold prior to Aguirre's fall, TBMK had worked with A.L.L. to create and approve its alternate design.

The district court granted summary judgment for the defendants on both the section 414 and res ipsa loquitur theories of liability. First, the court stated that under Illinois law res ipsa loquitur requires a defendant to be in exclusive control of the instrumentality of the injury. Thus, the court concluded, this theory could not be used because A.L.L. employees constructed the scaffold from which Aguirre fell. Turning to section 414 of the *Restatement*, the court determined that although TBMK exercised extensive authority over work site safety, TBMK could not be liable because "the contract between TBMK and A.L.L. provided that A.L.L. controlled operative work

details. . . . [and] its workers' safety." The court noted that "A.L.L. was contractually required to comply with TBMK's safety program, design its own safety program tailored to TBMK's safety standards, and employ personnel to ensure compliance." Thus, the court held, no duty of care could exist "because [TBMK] did not have control of the incidental details of A.L.L.'s work or its workers' safety." The plaintiffs appealed.

## II. Discussion

We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When we must decide an unsettled question of state law while sitting in diversity, as we are here, we are obligated to determine how the highest court of that state would rule. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 720 (7th Cir. 2004). We review de novo a district court's interpretation of the content of state law. *Id.* (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991)).

### A.  Section 414 Liability

The *Restatement (Second) of Torts*, section 414 states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise

> reasonable care, which is caused by his failure to
> exercise his control with reasonable care.

The "retained control" theory of negligence liability described in section 414 was adopted by the Illinois Supreme Court in *Larson v. Commonwealth Edison Co.,* 211 N.E.2d 247 (Ill. 1965). However, some confusion has arisen recently among Illinois intermediate appellate courts regarding whether section 414 states a theory of vicarious liability or direct liability. *See, e.g.*, *Cochran v. George Sollitt Const. Co.*, 832 N.E.2d 355, 361 (Ill. App. Ct. 2005). Although the Illinois Supreme Court has yet to lend its guidance on this issue, we are confident it would interpret section 414 in accordance with its plain language and accompanying commentary, which clearly state a theory of direct liability for a general contractor's own negligence, not a basis for imposing vicarious liability on a general contractor for the negligence of a subcontractor.

The bulk of the existing confusion stems from comment *a* to section 414, which states:

> If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable

> care so as to prevent the work which he has ordered to be done from causing injury to others.

Some courts, including the district court in this case, have mistakenly read this comment as first laying out when section 414 applies, *see, e.g.*, *Cochran*, 832 N.E.2d at 361 ("As comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence . . . ."), then explaining that no liability can exist if the general contractor "retain[s] only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others." *See Aguirre v. Turner Constr. Co.*, 2006 WL 644009 at *3 (N.D. Ill. Mar. 9, 2006).

Properly read, comment *a* does just the opposite. The first sentence does not explain the scope of section 414, but rather merely refers to the principles of vicarious liability within the *Restatement of <u>Agency</u>*. Where the level of retained control gives rise to a master-servant relationship, the master will be liable for the torts of his servant; this is no-fault vicarious liability and it is based on the principles of agency law, not negligence law. When comment *a* continues with "[t]he employer may, however, retain a control less than that which is necessary to subject him to liability as master" and "may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others," the commentators are demarcating the boundary between agency law (which if applicable imposes vicarious liability) and the negligence principles encompassed in section 414.

As the next sentence of the comment explains, section 414 takes over where agency law ends by providing a theory of direct liability based on the existence of a duty of

reasonable care. That duty is triggered when the employer—usually a general contractor—has retained supervisory control over the independent contractor without retaining control over all operative details of a project. As comment *b* explains, the rule stated in section 414 "is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job." Comment *b* elaborates that negligence liability arises in this situation if the general contractor "knows or by the exercise of reasonable care should know that the subcontractors' work is being [done dangerously], and has the opportunity to prevent it by exercising the power of control which he has retained in himself." Liability also arises if the general contractor "knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control to cause the subcontractor to do so."

Proceeding on the understanding that section 414 states a theory of direct liability based on a general contractor's failure to exercise reasonable care, whether TBMK retained a level of control sufficient to give rise to a duty to exercise reasonable care is a question of law.[1] *See Rangel v. Brookhaven Constructors, Inc.*, 719 N.E.2d 174, 176 (Ill. App. Ct. 1999). As comment *c* to section 414 explains:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to

---

[1] We note that at oral argument the Aguirres acknowledged that their section 414 claim is a direct liability claim; they abandoned any vicarious liability claim.

order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Illinois courts have held that "an employer need only retain the control of *any part of the work* in order to be subject to liability for a failure to exercise his control with reasonable care." *Brooks v. Midwest Grain Prods. of Ill., Inc.*, 726 N.E.2d 153, 155 (Ill. App. Ct. 2000) (emphasis added).

In determining whether that level of control has been retained, Illinois courts ask whether the principal merely retained general oversight of work progress and safety or actually engaged in detailed supervision and/or control of subcontractors' methods and means of performing work. *See, e.g.*, *Ross v. Dae Julie, Inc.*, 793 N.E.2d 68, 72 (Ill. App. Ct. 2003) ("[A] general right to ensure that safety precautions are observed and that work is done in a safe manner will not impose liability on the general contractor unless the evidence shows that the general contractor retained control over the means and methods of the independent contractor's work.").

The most prominent and closely comparable case in which a retained control duty of care was found to exist is *Bokodi v. Foster Wheeler Robbins, Inc.*, 728 N.E.2d 726 (Ill. App. Ct. 2000). In *Bokodi*, the Illinois appellate court found the existence of a duty based on the general contractor's extensive oversight of safety on a large-scale construction project. Specifically, the general contractor provided

29 safety measures and procedures that subcontractors were required to follow, employed safety personnel to monitor the site for compliance with its safety guidelines, gave its own employees broad powers to halt any subcontractor work based on a perception of an unsafe working environment, required subcontractors to conduct safety training meetings that the general contractor's employees could monitor, and required subcontractors to participate in its own safety programs. *Id.* at 735.

Although TBMK attempts to diminish *Bokodi*'s force by pointing to a number of recent cases that have found no duty under section 414, the facts of those cases are easily distinguishable. For example, in *Martens v. MCL Construction Corp.* the general contractor's employees had no authority to stop deficient work of subcontractors, 807 N.E.2d 480, 491 (Ill. App. Ct. 2004); in *Kotecki v. Walsh Construction Co.* the general contractor engaged in no oversight whatsoever of the work the plaintiff performed for the subcontractor, 776 N.E.2d 774, 778 (Ill. App. Ct. 2002); and in *Rangel* the general contractor promulgated no specific safety rules for the work in question, 719 N.E.2d at 177. By contrast, a duty *was* found to exist in *Moorehead v. Mustang Construction Co.*, a case more like *Bokodi* in that the general contractor had a detailed safety program in place and regularly monitored the subcontractor's work site for compliance with its own safety standards. 821 N.E.2d 358 (Ill. App. Ct. 2004). Indeed, even in rejecting the existence of a duty, the *Martens* court noted that "if a defendant's safety program sufficiently affected a contractor's means and methods of doing its work, then such program could bring the defendant within the ambit of the retained control exception." 807 N.E.2d at 492. Accordingly, nothing in these cases calls into question the application of *Bokodi* here.

The evidence of TBMK's extensive safety oversight is arguably even stronger than that of the general contrac-

tors in *Bokodi* and other similar Illinois cases. The record establishes that TBMK required A.L.L. to follow 23 rules specific to scaffold construction, that TBMK employees regularly walked the site and could require A.L.L. to correct any deficiencies observed in scaffolds, that TBMK inspected many of A.L.L.'s scaffolds, and notably, that TBMK imposed specific alternative design requirements on the scaffold from which Aguirre fell. These undisputed facts clearly establish that TBMK's safety program sufficiently affected A.L.L.'s means and methods of doing its work so as to give rise to a duty of reasonable care. In holding to the contrary, the district court emphasized that TBMK did not control all "the incidental details of A.L.L's work or its workers' safety." As we have explained, however, this kind of overarching retention of operative control described in comment *a* is necessary only when the claim asserted is one for vicarious liability under agency law. By contrast, section 414 describes the general contractor's duty of reasonable care that arises under negligence law when "the [sub]contractor is not entirely free to do the work in his own way," *see* comment *c*, which was clearly the case with regard to A.L.L.'s scaffolding.

The district court's attempt to distinguish *Bokodi* on contractual grounds is similarly inapposite. Although the contract between TBMK and A.L.L. placed A.L.L. in control of the operative details of its work, the same was true in *Bokodi*. 728 N.E.2d at 735. Nonetheless, as the district court recognized, the *Bokodi* court concluded that this contractual term was contravened by the "great lengths [the general contractor undertook] to enforce the safety standards at the work site." *Id.* Equally extensive precautions taken by TBMK—specific safety and design requirements, regular monitoring with authority to halt unsafe work—evince the same level of control over the details of A.L.L.'s scaffolding work, regardless of the contractual language to the contrary. The contractual

assignment of oversight of employee safety to A.L.L. does not control here for the same reason it did not in *Bokodi*, i.e., because TBMK's extensive safety oversight and requirements affected the means and methods by which A.L.L. sought to ensure the safety of its own employees.

Based on the remarkable similarities between *Bokodi* and this case, we conclude that TBMK retained sufficient control over the safety of scaffolding design and construction to give rise to a duty of reasonable care under section 414 of the *Restatement*. Of course, this holding does not mean the defendants are liable for Aguirre's injuries; that remains a question for the jury.

**B.  Res Ipsa Loquitur**

The doctrine of res ipsa loquitur allows for "proof of negligence by circumstantial evidence when the direct evidence concerning cause of injury is primarily within the knowledge and control of the defendant." *Kolakowski v. Voris*, 415 N.E.2d 397, 400 (Ill. App. Ct. 1980) (internal citation omitted). Illinois law provides that to prevail under res ipsa loquitur, a plaintiff must demonstrate he was injured: (1) in an occurrence that would not have happened in the absence of negligence; and (2) by an instrumentality under the management or control of the defendant. *Dyback v. Weber*, 500 N.E.2d 8 (Ill. 1986). Contrary to the district court's assertion, the Illinois Supreme Court has concluded that it is not necessary to establish the defendant's *exclusive* control over the instrumentality for the doctrine to apply. *See Lynch v. Precision Mach. Shop, Ltd.*, 443 N.E.2d 569, 573 (Ill. 1982). Rather, "the key question is whether the probable cause [of the injury] is one which defendant was under a duty to the plaintiff to anticipate or guard against." *Id.*

The plaintiff has alleged that his fall occurred when the scaffold collapsed due to negligent design or construction.

As we have discussed, there is sufficient evidence in this record that TBMK retained some control over both the design and construction of A.L.L.'s scaffolding. *Lynch* held that joint control of the sort TBMK and A.L.L. shared over the scaffolding design and construction is not a bar to the application of res ipsa loquitur in such a circumstance. *Id.* at 241. Accordingly, there is a genuine issue of material fact as to both elements of res ipsa loquitur, and the plaintiffs may proceed on that theory as well.

For the foregoing reasons, the district court's grant of summary judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

　　　　Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*