# Illinois Official Reports

## Appellate Court

---

### *Gerasi v. Gilbane Building Co.*, 2017 IL App (1st) 133000

---

Appellate Court
Caption

JEFFREY G. GERASI, Plaintiff-Appellant, v. GILBANE
BUILDING COMPANY, INC., AT&T SERVICES, INC., and
JOHNSON CONTROLS, INC., Defendants (Gilbane Building
Company, Inc., Defendant-Appellee).

District & No.

First District, Second Division
Docket No. 1-13-3000

Filed

March 14, 2017

Decision Under
Review

Appeal from the Circuit Court of Cook County, No. 08-L-7258; the
Hon. James P. Flannery, Jr., Judge, presiding.

Judgment

Affirmed.

Counsel on
Appeal

Dwyer & Coogan, P.C., of Chicago (Patrick E. Dwyer II, James G.
McCarthy, James E. Coogan, Patrick E. Dwyer III, and James P.
Lynch, of counsel), for appellant.

Wiedner & McAuliffe, Ltd., of Chicago (Timothy D. McMahon,
David Sethi, Jordan M. Tank, and Michael D. Barnes, of counsel), for
appellee.

Panel JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Hyman concurred in the judgment and opinion.
Justice Pierce dissented, with opinion.


**OPINION**

¶ 1    Plaintiff Jeffrey Gerasi appeals from an order granting summary judgment to defendant Gilbane Building Company, Inc. (Gilbane). Gerasi contends that questions of material fact exist as to whether Gilbane retained control over the work of its subcontractor, Geary Electric (Geary), such that Gilbane may be directly liable under section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)) for its negligence in exercising its retained control.[1] Gerasi also argues that the trial court erred in denying his motion to reconsider its ruling on Gilbane's motion for summary judgment. Because we find no issues of material fact exist, we affirm the ruling of the trial court.

¶ 2                                    BACKGROUND
¶ 3    Gilbane was hired by AT&T Services, Inc. (AT&T), to act as general contractor for the replacement of two air conditioning systems (the chiller project) used to cool telecommunications equipment at AT&T's Wabash telecommunications building at 520 South Federal Street in Chicago. Prior to the chiller project, Gilbane had worked on several AT&T construction projects at that building. Gilbane itself was not performing any work on the chiller project; its job was to coordinate the work of various subcontractors.

¶ 4    Operations at the Wabash building are overseen by a number of AT&T corporate groups, including construction management and property management. Construction management oversees new construction, such as the chiller project, at the building. Property management, along with the building's engineer, Johnson Controls, Inc. (JCI), inspects, maintains, and performs (or arranges for) repairs to the building, including its existing electrical equipment. Any work by contractors on new projects that involves or could affect the building's existing electrical equipment requires JCI's prior approval.

¶ 5    Gilbane hired Geary to perform electrical work on the project. Gilbane had worked with Geary on a number of earlier projects at the Wabash building. Further, Geary had worked at the Wabash building off and on for 40 years prior to the chiller project and was thus familiar with the building's electrical systems. Geary was hired for its electrical expertise and its experience in working with the electrical systems at the Wabash building.

¶ 6    Maintenance of optimal temperature and air quality at a telecommunications center is critical to the system's operation. In particular, temperatures that are too high, even for a brief period of time, can affect the integrity of the system and result in interruption of service to customers. Heating and cooling (HVAC) systems at AT&T's telecommunications centers are powered by a number of motor control centers (MCC), discussed in more detail below.

---

[1]Although Gerasi originally argued that he had also pursued a theory of vicarious liability against Gilbane, he has since abandoned that argument.

¶ 7    Gilbane entered into written contracts with both AT&T (AT&T/Gilbane contract) and Geary (Gilbane/Geary contract). The AT&T/Gilbane contract charged Gilbane with providing general contractor services. Pursuant to the contract, during the construction phase, Gilbane was to conduct weekly on-site meetings and weekly method of procedure (MOP) safety meetings.

¶ 8    An MOP is a document that describes a detailed outline of the steps to be followed to complete a particular procedure. Its purpose is to "ensure adequate precautions *** to protect against service interruptions and injury to personnel." There was a general MOP covering the chiller project as a whole. More detailed MOPs were prepared by subcontractors for various aspects of the work in connection with the project. Detailed MOPs were required for "any work that puts building equipment, personnel, or services in jeopardy." For example, a detailed MOP would be required if a subcontractor's work entailed powering down an MCC. MOPs for the chiller project were reviewed and signed off on by the subcontractor that prepared the MOP, Gilbane, JCI, and AT&T. Gilbane was responsible for coordination of all of the MOPs on the project.

¶ 9    The AT&T/Gilbane contract required Gilbane to place "the highest importance and priority on health and safety for the [w]ork performed" and provided that Gilbane was "responsible for the safety and protection of the [w]ork, workers of [c]ontractor and [s]ubcontractors, and any other persons or public or private property as required by law." Gilbane was responsible for administering the AT&T/Gilbane safety plan, a 64-page document, which set forth the responsibilities of Gilbane and the subcontractors charged with performing the work. Gilbane "was responsible for the active control" of the safety plan and had the authority to require a contractor to submit an MOP for a particular procedure.

¶ 10    Because AT&T was concerned about service interruption, the contract also stated that Gilbane was required to maintain "electric power, light energy and telephone service *** without interruption at all times." AT&T's concern over service interruptions related not only to inconvenience to its customers as a result of the loss of telephone signal but also, and more importantly, to its customers' inability, even momentarily, to make 9-1-1 emergency calls.

¶ 11    Pursuant to the Gilbane/Geary contract, Geary's work was performed under the general direction of Gilbane. Gilbane retained control over schedules and milestones. Geary was bound to and assumed toward Gilbane all the obligations and responsibilities Gilbane assumed towards AT&T. Geary agreed to adhere to, among other things, Gilbane's safety plan "so as to avoid injury or damage to persons or property, and to be directly responsible for damage to persons and property resulting from the failure to do so."

¶ 12    Under Gilbane's safety plan, Geary was required to designate a project site safety coordinator who would devote at least 20 hours per week, and occasionally full-time attention, to safety issues. Geary was required to decide whether a particular task called for an MOP and, if so, to formulate the steps to complete that operation and present it to Gilbane.

¶ 13    Gilbane's safety plan gave Gilbane "active control" and made Gilbane responsible for "planning and requiring all work to be done in compliance with the [plan]" and "weekly inspections relating to all safety" to be conducted and documented. Specifically referring to energized equipment or electrical circuit in the work area, Gilbane's safety plan provided:

> "Contractor [(defined as 'any company performing work under the contract')] shall determine before operations start if there is any energized equipment or electrical circuit in the work area, which might have risk to the worker. Equipment and

- 3 -

conductors that must be de-energized shall be identified to Gilbane who [will] arrange to de-energize the equipment under the Lockout and Tagging procedure/system."

Thus, it was the subcontractor's obligation to identify equipment that needed to be de-energized in order for the subcontractor to do its work. Prior to Gerasi's accident, Geary never identified to Gilbane any equipment it believed needed to be de-energized. Gilbane's safety plan further provides that "electrical tie-ins shall be conducted only on de-energized (locked out and tagged out) systems. If a condition makes this procedure impossible then a pre-task safety meeting with Gilbane is required."

¶ 14    Geary had its own safety manual. Under "Geary Electric Safety Mission," the manual stated: "All members of management and supervision are charged with the responsibility of preventing incidents or conditions that could lead to occupational injuries [or] illness. While the ultimate success of a safety and health program depends upon the full cooperation of each individual employee, it is management's responsibility to see that safety and health rules and procedures are adequate and enforced." Geary's project foreman on any given project was "directly responsible for the control and activities of the tradesmen. [The foreman] play[s] a key role in implementing an effective safety process on the jobsite." Among other responsibilities, the project foreman was charged with providing and requiring the use of hard hats and "other personal protection as indicated by the operation" such as eye, face, and hand protection. Personal protective equipment supplied by Geary for its workers' use on the project was kept in a designated area on the 10th floor of the building. Any worker who felt the need to use such equipment could do so.

¶ 15    Tom Persin was Gilbane's construction manager on the project. Persin, as Gilbane's only employee on the job, did not provide full-time supervision of the construction, nor was Gilbane asked to provide such supervision by AT&T. Persin conducted the required weekly safety meetings and visited the site, on average, one more time each week, spending approximately two to three hours on each visit. Attendees at the weekly safety meetings included representatives of AT&T, including the departments in charge of operations at the building, JCI, and the various subcontractors on the project. Persin was not present nor did he visit the site the day Gerasi was injured.

¶ 16    The project periodically entailed the provision of temporary power to equipment operated by subcontractors, including pipefitters who were doing welding at the site. It was Geary's responsibility, as the electrical subcontractor, to identify possible power sources as necessary. Geary electricians had performed temporary electrical tie-ins on this, as well as other, earlier projects at the building.

¶ 17    The electrical work involved in providing temporary power, *i.e.*, connecting the equipment to an available breaker, was not included in the price under Geary's subcontract and thus generated an extra charge, which had to be approved by Gilbane. Prior to December 5, 2006, Geary had twice arranged temporary power tie-ins for welders operated by Air Comfort, the pipefitting subcontractor. On those occasions, Air Comfort contacted Geary's superintendent, Steve Soltys, to request temporary power. Soltys then contacted Persin to approve the charge for the tie-in. After receiving Persin's approval, Soltys identified an available breaker and then sought approval from JCI to make the connection for the temporary power source. At one of the weekly safety meetings conducted by Persin prior to the incident involving Gerasi, Persin informed Soltys that in order to expedite the process, Geary could go directly to JCI to identify a power source for temporary tie-ins and that

Soltys did not need to obtain advance approval for the charge from Persin. Only JCI, as the building's manager, could authorize the shutdown of an entire MCC. Under its contract with AT&T, Gilbane had no authority to power down an MCC or override any decision by JCI regarding work that could affect the building's existing electrical systems.

¶ 18 On December 5, 2006, Air Comfort asked Soltys to provide a temporary electrical tie-in for one of its welders. Soltys identified an available breaker in the MCC on the third floor of the building, determined that it was not in use, and sought and obtained permission from JCI to use it for the connection. On the two prior occasions Soltys had arranged temporary tie-ins for Air Comfort, Soltys himself did the electrical work necessary to make the connection. He did not request that the entire MCC be de-energized nor did he wear any personal protective equipment, such as protective glasses or gloves when he connected the welder to the breaker. There is some evidence that Soltys asked JCI on December 5 if the MCC could be powered down before the tie-in, although Soltys denied he made such a request and no witness from JCI recalled it either.

¶ 19 An MCC contains circuit breakers of various voltages, each housed in its own compartment. The breaker Soltys identified was inside a metal compartment or "bucket" that was located inside the third floor MCC. The MCC provides power to the breakers through bus bars on the back of the bucket. The bus bars connect to the "line" or "live" side of the breaker behind the back of the bucket. The "load" side of the breaker faces the door of the bucket. The breaker is accessed by opening the handle on the bucket door. The load side of the breaker is de-energized when the bucket handle is opened and remains so as long as the door is open. The line side of the breaker can only be de-energized by either powering off the entire MCC or by pulling the bucket out of the MCC. If a bucket is pulled out of the MCC, it is disconnected from the power source. Since the early 1970s, AT&T had not permitted electricians to pull buckets out of an MCC because brackets on the buckets could break, which could, in turn, short out the entire system. The bucket was specifically designed to allow workers to make temporary power connections without having to shut down an entire MCC.

¶ 20 On December 5, after Soltys identified the available power source, he was called away to respond to an emergency alarm regarding an HVAC malfunction at a nearby AT&T building and so instructed Gerasi to perform the tie-in. Gerasi, a Geary foreman and journeyman electrician, had personally performed temporary tie-ins "hundreds of times" on this and other projects with similar equipment. Gerasi was not in the habit of wearing personal protective equipment for such tasks, nor did he believe such equipment was required given that the load side of the breaker was not energized. Further, the gloves provided to protect an electrician's hands are bulky and the housing for the breaker is small, thus rendering it difficult to wire the connections using gloves.

¶ 21 Neither Tom Berk, Geary's owner, nor Soltys considered a temporary tie-in as involving "live" work. Rather, because the load side of the bucket was de-energized when the door was open, Berk and Soltys both believed that temporary tie-ins, such as the one performed by Gerasi, were safe and that the lockout and tagging procedure described above was not required. Thus, neither on this occasion nor on any prior occasion did Geary identify to Gilbane equipment it believed needed to be de-energized so that Gilbane could initiate the lockout and tagging procedure. Geary electricians had performed tie-ins on other projects at

the Wabash building in the same manner, all without incident and without encountering any defective breakers.

¶ 22    Had either Berk or Soltys observed Gerasi performing the tie-in on December 5 without personal protective equipment, neither would have stopped him from doing so because they did not believe that what Gerasi was doing was unsafe. By the same token, they would not have expected that had Persin observed Gerasi performing the tie-in, he would have discerned any hazard. Asked to quantify the risk to Gerasi from the manner in which he performed the tie-in on December 5, Berk stated, "zero." Finally, any defect in the breaker that posed a risk of an arc flash could not have been detected on visual inspection.

¶ 23    Before performing the tie-in, Gerasi tested the inside of the bucket with a meter and determined that it was not "hot," *i.e.*, energized. Gerasi proceeded to perform the tie-in, which entailed attaching leads from the welding machine to three connections on the breaker, as well as a fourth ground wire. Since Gerasi was not using any personal protective equipment and, in particular, was not wearing protective gloves, he was handling the leads with his bare hands.

¶ 24    Using one type of screwdriver, Gerasi attached the leads to the breaker by wrapping the wires around the three connections on the breaker and tightening the screws. He then proceeded to further tighten the connections using another screwdriver with a wider head. As he attempted to tighten the third connection, he noticed that it was "wiggling." According to Gerasi, he then used his left hand to grip the breaker and had his right hand on the bucket when an arc flash of electricity occurred, seriously injuring him. Gerasi had been working for only about 10 to 15 minutes when the accident occurred. There were no other witnesses to the accident, and Gerasi could not say what caused it.

¶ 25    Immediate following the accident, the third floor MCC was briefly de-energized. Soltys and another Geary employee removed the bucket containing the breaker Geary was working on from the MCC, checked the bus bars for any apparent defects and, finding none, re-energized the system.

¶ 26    It was later determined that the breaker failed for unknown reasons. AT&T's property management group and JCI, as owner and maintenance manager, respectively, were responsible for inspection, maintenance, and repair of existing electrical systems, including circuit breakers, at the Wabash building. No evidence suggested that Gilbane had any responsibility for maintenance, inspection, or repair of the building's electrical systems unless requested to do so by AT&T. Such activities were not within the scope of Gilbane's contract with AT&T for the chiller project.

¶ 27    Before Gerasi's accident, Geary did not propose an MOP for temporary tie-ins because neither Berk nor Soltys believed such work posed a risk, either to the safety of the worker or to the integrity of AT&T's telecommunications system given that the load side of the breaker was de-energized as long as the door was open. Following Gerasi's accident, Geary proposed an MOP relating to temporary tie-ins. The MOP prepared by Geary following the accident did not call for powering down the MCC in order to make a temporary tie-in. Upon reviewing the proposed MOP, Persin determined that it included no reference to the use of personal protective equipment. This was the first time Persin learned that Geary was performing tie-ins without personal protective equipment. Persin instructed Geary to include a requirement to use such equipment in the MOP.

¶ 28    On one occasion after Gerasi's accident, Soltys performed another temporary tie-in for a welder. Pursuant to the MOP, Soltys donned a protective suit, a tinted face shield and gloves to make the connection. Because the face shield interfered with his vision, he required another employee to hold a light for him. Soltys determined that he could not connect the wires with the gloves on and, notwithstanding the new MOP, made the connection after taking the gloves off. Although a summary of the postaccident meeting among the principals on the project, including Gilbane, Geary, and AT&T, indicated that Geary should notify Gilbane before attempting any activity it did not believe could be performed with personal protective equipment, there is no evidence Soltys advised Persin before making the connection without the gloves.

¶ 29    Gerasi filed this action against Gilbane, AT&T, and JCI on July 3, 2008. Gerasi filed his third amended complaint on November 19, 2012. In count I against Gilbane, Gerasi alleged that Gilbane, individually and through its agents, had a duty to (i) supervise the work on the project; (ii) ensure that the work was being performed in a safe and suitable manner; (iii) determine that the equipment used in the course of the project was safe; and (iv) stop work that was being done in an unsafe manner or on equipment that was unsafe, improperly maintained, or that had not been properly tested to determine its safety. Gerasi alleged that Gilbane was negligent in that, among other things, it failed to (i) instruct workers to de-energize electricity to equipment before work was performed; (ii) turn off, lock out, and tag out "defective or damaged electrical devices"; (iii) warn that the circuit breaker on which Gerasi worked was (a) energized, (b) not properly maintained, and (c) defective; (iv) implement a program for the inspection, maintenance, and replacement of defective circuit breakers; (v) provide safety gear and a safe place to work; and (vi) employ an electrical engineer to consult on the use of electrical equipment as part of the project. Gerasi further alleged that Gilbane's negligence caused an electrical arc flash explosion resulting in severe injuries, leaving him permanently disabled with chronic nerve pain disorder.

¶ 30    On January 11, 2013, plaintiff disclosed the opinions of his construction safety expert, Frank Burg, and electrical expert, Brian Vandal. Shortly thereafter, Gilbane filed its motion for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2010)). In its motion, Gilbane argued that the undisputed facts demonstrated that it did not have notice that the manner in which Gerasi performed his work was unsafe and that it exercised its supervisory responsibilities on the project with reasonable care. Gerasi requested six months to respond to the motion, citing ongoing expert discovery.

¶ 31    Gerasi responded to Gilbane's summary judgment motion on June 25, 2013, and relied, in part, on the testimony of Burg and Vandal, whose depositions had been taken in the interim. Burg believed that Gilbane was negligent for failing to require electricians to use personal protective equipment when performing tie-ins. In Burg's opinion, it would have been safer for the entire system to be de-energized before performing the tie-in. Burg faulted Gilbane for not enforcing its safety rules on the project. According to Vandal, Gilbane should have considered whether the MCC could have been de-energized before the tie-in or should have scheduled the work for a time when de-energizing the MCC would pose the least threat to the interruption of telephone service. Prior to filing his response, Gerasi did not claim that Gilbane's motion was premature or that he required additional discovery pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013).

¶ 32    On July 2, 2013, before the hearing on Gilbane's motion, Gerasi deposed Gilbane's safety expert, Timothy Galarnyk. At the hearing on the summary judgment motion on July 23, 2013, neither counsel for Gerasi nor counsel for Gilbane alluded to Galarnyk's deposition or suggested that it was relevant to the pending motion. At the conclusion of the hearing, the trial court entered summary judgment in favor of Gilbane finding that there was "no evidence of actual or constructive knowledge by Gilbane of any unsafe act or condition at the time of, or before plaintiff's injury."

¶ 33    Gerasi filed a motion to reconsider on August 6, 2013, citing as "new" evidence the testimony of Galarnyk and two additional defense expert witnesses he had deposed after summary judgment was granted in Gilbane's favor. Three days before Gilbane's response to the motion to reconsider was due, Gerasi filed an "emergency" motion under Illinois Supreme Court Rule 191(b) to supplement his motion to reconsider with the depositions of two more expert witnesses designated by defendants who had yet to be deposed.

¶ 34    On August 28, 2013, after summary judgment was entered in favor of Gilbane, Gerasi settled with AT&T and JCI. On August 29, 2013, the court denied Gerasi's motion to reconsider the summary judgment in favor of Gilbane. The court did not enter an order on Gerasi's pending motion to supplement nor did counsel for the parties request an order.

¶ 35    On September 10, 2013, the attorneys for Gerasi, AT&T, and JCI returned to court to enter an agreed order dismissing Gerasi's claims against those defendants in exchange for a combined payment of $2.5 million and finding the settlements to be in good faith. Counsel for Gilbane was not present given that Gerasi's motion to reconsider had been denied and Gilbane had no objection to the good faith finding in favor of AT&T and JCI. At the conclusion of the hearing and without notice to counsel for Gilbane, Gerasi's counsel presented the court with a typewritten order granting his Illinois Supreme Court Rule 191(b) motion to supplement, which the court allowed. Gilbane's counsel received a copy of the order after it was entered.

¶ 36    On September 16, 2013, Gilbane filed an emergency motion asking the court to vacate its September 10 order granting Gerasi's motion to supplement, pointing out that counsel for Gerasi was aware that Gilbane objected to the motion and counsel had failed to advise Gilbane's counsel that he intended to present an order at the September 10 hearing.

¶ 37    On September 18, 2013, before the court ruled on Gilbane's motion, Gerasi filed a notice of appeal from the orders granting summary judgment to Gilbane and denying his motion to reconsider. At the hearing on Gilbane's motion, Gerasi argued that in light of the notice of appeal, the court lacked jurisdiction to vacate the September 10 order. The court rejected this argument and granted the motion to vacate but permitted Gerasi's counsel to file the disputed deposition transcripts so that they would be included in the record on appeal. Gerasi then amended his notice of appeal to include the court's ruling on Gilbane's motion to vacate.

¶ 38                                                    ANALYSIS

¶ 39    Our supreme court recently reiterated the well-settled standards applicable to summary judgment motions in *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25:

> "Summary judgment is appropriate only where 'the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.' 735 ILCS 5/2-1005(c) (West 2012). In determining whether a genuine issue of material fact exists, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. A genuine issue of material fact exists 'where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts.' *Id.* We review summary judgment rulings *de novo. Bruns v. City of Centralia*, 2014 IL 116998, ¶ 13."

If the plaintiff cannot establish each element of his or her cause of action, summary judgment for defendant is proper. *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶¶ 25-26.

¶ 40      In order to recover damages based on a defendant's alleged negligence, the plaintiff must plead and prove sufficient facts to establish a duty on the part of the defendant and a breach of that duty proximately causing plaintiff's injuries. *Carney*, 2016 IL 118984, ¶ 26. "Whether a duty exists is a question of law appropriate for summary judgment." *Id.* (citing *Bruns*, 2014 IL 116998, ¶ 13). " 'In the absence of a showing from which the court could infer the existence of a duty, no recovery by plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper.' " *Bruns*, 2014 IL 116998, ¶ 13 (quoting *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991)). Similarly, plaintiff's negligence claim must fail if the undisputed evidence does not establish a breach of duty owed to plaintiff by defendant or a proximate relationship between defendant's breach and plaintiff's alleged injuries. *Neimiec v. Roels*, 244 Ill. App. 3d 275, 278 (1993) (defendant entitled to summary judgment where no evidence indicated that she breached her duty of care to plaintiff); *Abrams v. City of Chicago*, 211 Ill. 2d 251, 264 (2004) (defendant entitled to summary judgment where its alleged negligence was not the proximate cause of plaintiff's injuries).

¶ 41      "Under the common law, one who employs an independent contractor is not liable for harm caused by the latter's acts or omissions." *Carney*, 2016 IL 118984, ¶ 31 (citing *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 42). This is because in a true independent contractor situation, the independent contractor " 'undertakes to produce a given result without being in any way controlled as to the method by which he attains that result.' " *Id.* ¶ 31 (quoting *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 538 (1931)). Furthermore, "[b]ecause the hiring entity has no control over the details and methods of the independent contractor's work, it is not in a good position to prevent negligent performance, and liability therefor should not attach." *Id.* ¶ 32.

¶ 42      A hiring entity's immunity from liability is not absolute in the case of work performed by an independent contractor when the former has retained some control over the independent contractor. Under section 414 of the Restatement (Second) of Torts, "[o]ne who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414, at 387 (1965). In other words, although the degree of retained control may be insufficient to give rise to vicarious liability as in a principal-agent or master-servant relationship, direct liability may yet be incurred if the hiring entity negligently exercises or fails to exercise its retained control. Section 414 applies to negligence cases

arising out of construction-related injuries and is an expression of Illinois common law. *Carney*, 2016 IL 118984, ¶ 35.

¶ 43 Prior to *Carney*, some Illinois courts interpreted section 414 as addressing both direct and vicarious liability based on comment a, which states: "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant." Restatement (Second) of Torts § 414 cmt. a, at 387 (1965). See, *e.g.*, *Cabrera v. ESI Consultants, Ltd.*, 2015 IL App (1st) 140933, ¶ 102; *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶¶ 123, 149. But *Carney* makes clear that section 414 pertains only to a hiring entity's direct liability for its own negligence:

"The first sentence of comment a does not explain when section 414 applies. Rather, it explains when section 414 does not apply. [Citation.] If the control retained by the employer is such that it gives rise to a master-servant relationship, thus negating the person's status as an independent contractor, the employer may be liable for the negligence of the contractor's employees under the law of agency. Agency law, under which an employer may be vicariously liable for the torts of its employees, is distinct from the principles encompassed in section 414, under which an employer is directly liable for its own negligence. In short, 'section 414 takes over where agency law ends.' [Citation.]" *Carney*, 2016 IL 118984, ¶ 38.

¶ 44 The concept of "retained power of control," which can give rise to a hiring entity's direct liability, is outlined in comment c to section 414:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations, which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c, at 388 (1965).

¶ 45 When the hiring entity has retained some degree of control over the manner in which the work is done by the subcontractor, comment b of section 414 comes into play. Comment b applies "usually, though not exclusively, *** when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job." Restatement (Second) of Torts § 414 cmt. b, at 387 (1965). Under comment b, a general contractor may be directly liable for its own negligence if it "fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if [it] knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which [it] has retained." Restatement (Second) of Torts § 414 cmt. b, at 387-88 (1965).

¶ 46 Thus, in construction negligence cases under section 414, issues of fact may arise as to (i) whether the hiring entity retained control over the manner in which the subcontractor

performed its work, (ii) if so, whether the hiring entity knew or should have known that the subcontractor's work was being done in a manner unreasonably dangerous to others, (iii) whether the hiring entity failed to exercise reasonable care to prevent its subcontractor's dangerous conduct, and (iv) whether the hiring entity's failure to exercise reasonable care in connection with its retained control proximately caused the plaintiff's injuries.

¶ 47    Pattern jury instructions used in construction negligence cases underscore these elements of the plaintiff's burden of proof. The introductory instruction reads, as relevant here: "A contractor who entrusts work to a subcontractor can be liable for injuries resulting from the work if the contractor retained some control over the safety of the work and the injuries were proximately caused by the contractor's failure to exercise that control with ordinary care." Illinois Pattern Jury Instructions, Civil, No. 55.01 (2011) (hereinafter, IPI Civil (2011) No. 55.01). The burden of proof instruction tells a jury that the plaintiff in a construction negligence case has the burden to prove that (i) defendant retained some control over the safety of the work, (ii) defendant acted or failed to act in specified ways, and in so acting or failing to act was negligent in the manner in which it exercised, or failed to exercise, its retained control, (iii) plaintiff was injured and (iv) defendant's negligence was a proximate cause of plaintiff's injuries. IPI Civil (2011) No. 55.03.

¶ 48    With respect to Gerasi's claim that Gilbane's own negligence renders it potentially liable for his injuries, we note that in the trial court Gilbane did not contend that it lacked sufficient retained control to support the imposition of liability under section 414. Rather, Gilbane's motion for summary judgment focused on the lack of notice to Gilbane of the claimed unsafe manner in which Geary was performing temporary tie-ins and Gilbane's claim that the evidence demonstrated that it had exercised its supervisory authority over Geary's work with reasonable care. In other words, Gilbane argued that the predicates to liability of a contractor who retains control—knowledge or reason to know of its subcontractor's unsafe work and the failure to reasonably exercise that control to prevent the unsafe work—were not present in this case. But in a supplemental brief addressing *Carney* and at oral argument, counsel for Gilbane contended that Gilbane did not, in fact, retain control over Geary's work. While we would be reluctant to affirm summary judgment on this significant threshold issue when it was not presented to the trial court, we will nevertheless address it briefly as we do not find it dispositive.

¶ 49    Several Illinois decisions have addressed the existence of a duty in the context of construction projects where the general contractor retained control over safety on the site. In *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 497 (2008) (cited with approval in *Carney*, 2016 IL 118984, ¶ 61), the general contractor required the subcontractor to comply with a list of 21 safety regulations it had prepared and to attend weekly safety meetings. The general contractor had three supervisory employees on the site with authority to stop any work being performed in a dangerous manner. *Id.* at 494. Shortly before the accident in which the subcontractor's employee was injured, the general contractor wrote to the subcontractor specifically regarding work being performed without fall protection, the condition that led to the plaintiff's injuries. *Id.* at 494-95. Under these circumstances, this court concluded that even though the contract between the general and subcontractor left control of the operative details of the work to the subcontractor, issues of fact precluded summary judgment in favor of the general contractor because it retained "more than a general right of supervision" and was on notice of the unsafe practice prior to the plaintiff's injury.

*Id.* at 497; compare *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 830-31 (7th Cir. 2007) (retained control found where general contractor required subcontractor to follow 23 rules specific to scaffold construction, its employees regularly walked the construction site and could require the subcontractor to correct any deficiencies observed in scaffolds, general contractor inspected many of the subcontractor's scaffolds and imposed specific alternative design requirements for the scaffold from which plaintiff fell), and *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063 (2000) (summary judgment improper where general contractor employed full-time safety manager to conduct weekly safety meetings and monitor the work site for compliance with safety standards), with *Carney*, 2016 IL 118984, ¶¶ 47, 54, 61 (summary judgment based on absence of retained control proper where contract between owner and contractor placed the contractor in charge of work site safety, owner's representative did not oversee subcontractor's work and was not on site at time of plaintiff's injury, and the owner's discussions with contractor after plaintiff's accident were simply an attempt to promote worker safety and avoid another injury), and *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 206 (2005) (summary judgment in favor of general contractor properly granted because the general did not control and was not responsible for safety measures at the construction site and no other evidence suggested that the general actually exerted control over the subcontractor's work).

¶ 50    This case falls somewhere in between *Wilkerson* and *Carney*. Gilbane's contract with AT&T vested it with the overall responsibility for safety on the chiller project. Further, Gilbane required subcontractors, including Geary, to adhere to the provisions of its extensive safety plan. Finally, Gilbane's postaccident conduct in insisting that the MOP regarding temporary tie-ins require that electricians wear personal protective equipment, while not relevant to prove Gilbane's negligence, does suggest that Geary was not entirely free to perform this task in its own way. See *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300, 301 (1995); *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 72.

¶ 51    But unlike those cases where retained control sufficient to implicate liability under section 414 has been found, here Gilbane did not personally oversee all the work performed on the project. It had no full-time foreman or safety manager on site. Gilbane's contract with AT&T required Gilbane to provide full-time supervision only at AT&T's written request and there is no evidence of such a request in the record. Gilbane's sole employee for the project, Persin, never observed Geary electricians perform a temporary tie-in, nor was he on site the day Gerasi was injured. Further, at oral argument, Gilbane's counsel contended that Soltys' conduct in performing a temporary tie-in without gloves, even after a postaccident MOP requiring that he do so, is evidence that Gilbane never controlled the means and methods of Geary's electrical work on the project.

¶ 52    If retained control was the basis of the trial court's summary judgment ruling, these competing arguments would likely have prompted us to find that genuine issues of material fact precluded a ruling in Gilbane's favor as a matter of law. But since retained control was not the focus of the trial court's ruling, we will assume, without deciding, for purposes of our remaining analysis, that Gilbane retained control sufficient to trigger potential liability under section 414.

¶ 53    Because no agency relationship exists between a general contractor and an independent contractor, retained control alone will not result in the imposition of liability. See *Aguirre*, 501 F.3d at 831 (finding that contractors retained sufficient control over scaffold design to

give rise to a duty of reasonable care under section 414 did not automatically render defendants liable for plaintiff's injuries; "that remains a question for the jury"). As noted above, in order to withstand Gilbane's motion for summary judgment, Gerasi was also required to demonstrate some factual basis for finding that Gilbane negligently breached a duty within the scope of its retained control and that its breach proximately caused Gerasi's injuries. Here, Gilbane contends that it reasonably fulfilled its responsibilities to oversee safety on the project by implementing a comprehensive safety plan and conducting weekly safety meetings on site. Gilbane also argues that it did not know or have reason to know that the method Gerasi used for performing the tie-in was unsafe or that the breaker on which he was working was defective. Thus, Gilbane contends that nothing it did or failed to do was the proximate cause of the accident.

¶ 54    Gerasi argues that *Carney*, by failing to reference the owner's notice or lack of notice of the unsafe manner in which the contractor was performing its work, dispensed with the relevance of that factor in a section 414 analysis. We disagree. *Carney* addressed the threshold issue of whether the owner retained control over the contractor's work and found such control lacking under the facts presented. Because *Carney* found, as a matter of law, that the owner did not retain control over the subcontractor's work, our supreme court was not required to address the issue of notice, which is relevant only if retained control is found to exist.

¶ 55    Gerasi's reading of *Carney* would read comment b out of section 414 and require virtually every case in which retained control is found to be submitted to a jury. But neither section 414 nor Illinois common law imposes liability on hiring entities based solely on retained control over work performed by independent contractors. As in any other negligence case, a plaintiff must still prove some negligent act within the scope of retained control and a proximate relationship between that negligence and plaintiff's injuries. Thus, again assuming Gilbane retained sufficient control over Geary's work to implicate section 414, we turn to the remaining factors Gerasi was required to prove in order to hold Gilbane liable: that Gilbane was negligent in the manner in which it exercised its retained control and Gilbane's negligence was a proximate cause of Gerasi's injuries.

¶ 56    We first consider whether genuine issues of material fact exist as to whether Gilbane was negligent in the manner in which it exercised its retained control over safety on the chiller project. Gerasi's complaint alleged that Gilbane failed to (i) instruct workers to de-energize electricity to equipment before work was performed; (ii) turn off, lock out, and tag out "defective or damaged electrical devices"; (iii) warn that the circuit breaker on which Gerasi worked was (a) energized, (b) not properly maintained, and (c) defective; (iv) implement a program for the inspection, maintenance and replacement of defective circuit breakers; (v) provide safety gear and a safe place to work; and (vi) employ an electrical engineer to consult on the use of electrical equipment as part of the project.

¶ 57    Several of Gerasi's allegations focus on what it characterizes as Gilbane's failure to "enforce" its safety plan. We find no evidentiary basis for Gerasi's contention that Gilbane was obligated to do more than it did to ensure that contractors complied with its safety plan. Per the terms of the AT&T/Gilbane contract, AT&T did not contract with Gilbane to provide full-time supervision of the project or require Gilbane's representatives to personally oversee the work of all subcontractors at the site. There is further no evidence that inspection, maintenance, or replacement of electrical equipment was within the scope of Gilbane's

agreement with AT&T. Without such obligations imposed on Gilbane by AT&T, Gerasi's attempt to predicate Gilbane's liability on its "failure to enforce" its safety plan must fail. Gilbane fulfilled its safety responsibilities by preparing its detailed safety plan, providing the plan to subcontractors, obtaining subcontractors' commitments to adhere to the safety plan, and conducting weekly safety meetings on site. Gilbane was further entitled to rely on Geary's designated safety officer to monitor compliance with both Gilbane's and Geary's own safety plan.

¶ 58    Gerasi argues that Gilbane "abandoned" its safety obligations on the project by removing itself from the chain of communication necessary to authorize a temporary tie-in. But there is no evidence that on prior occasions when Persin was consulted in reference to a temporary tie-in, his involvement resulted in the task being performed in any different or safer manner or that he ever personally observed a connection being made. Rather, the ultimate authority for identifying power sources available for another subcontractor's equipment rested with AT&T, through its property manager JCI. Gilbane had no say in identifying the power source or in approving any particular tie-in; it simply coordinated communication among the necessary parties and approved Geary's charge for extra work.

¶ 59    Further, there is no evidence that under its contract with AT&T, or in practice on the site, Gilbane had the authority to or did override any determination by JCI as to whether a temporary tie-in would be allowed or what power source would be used. Thus, as a practical matter, Gilbane's involvement in the process (other than to approve the additional charge associated with the work) was superfluous, and Persin's decision that Geary no longer needed to include him in the chain of communications simply meant that the process of obtaining authorization to provide a temporary power source was streamlined. Thus, we cannot find that Persin's decision to remove Gilbane from the process of obtaining permission from JCI for temporary tie-ins constitutes negligence on Gilbane's part.

¶ 60    It is important to note here that even after the MOP for temporary tie-ins was prepared following Gerasi's accident, Geary nevertheless failed to adhere to its provisions. In particular, Soltys attempted to perform another welder tie-in using personal protective equipment but was unable to connect the wires using the safety gloves and so made the connection with his bare hands, just as Gerasi had. While, as discussed above, different inferences may be drawn from this postaccident conduct for purposes of determining retained control, this conduct highlights that in the undisputed absence of any requirement that Gilbane personally supervise tie-ins to ensure that they conformed to its safety plan and the MOP, nothing that Gilbane did or failed to do contributed to Gerasi's accident.

¶ 61    It begs the question to argue, as Gerasi does, that de-energizing the entire MCC would have avoided his injury. It can almost always be said in hindsight that a different course of conduct would have avoided an injury. But the risks to AT&T's telecommunications system posed by that proposition, as well as the unanimous testimony from Gilbane and Geary witnesses that they did not consider the temporary tie-in performed by Gerasi to be "live" work that would implicate the lock out and tagging procedure in Gilbane's safety plan, prevents the conclusion that the failure to de-energize the MCC can be considered negligence on Gilbane's part. Further, even after the accident, no party, including Geary, proposed that the MCC be de-energized before performing a temporary tie-in.

¶ 62    Gerasi points to provisions in the various contracts providing that (i) "at [AT&T]'s request, [Gilbane]'s safety officer will visit the job site to ensure that the site is clean and safe

at all times," (ii) Gilbane "shall at all times, keep the premises in a clean and safe condition," and (iii) at the end of each day, Gilbane was to inspect the site to guard against "all hazards that might cause fire, damage or injury." But, given the specific provision that Gilbane was not required to be on the site full time unless requested by AT&T, these general provisions regarding safety of the job site cannot create a genuine issue of material fact regarding Gilbane's fulfillment of its safety responsibilities regarding work performed by subcontractors. And, other than the condition of the breaker (for which Gilbane had no responsibility), Gerasi does not fault Gilbane because the construction site, *per se*, was unsafe.

¶ 63     Even though Gilbane complied with the terms of its contracts, it could still incur liability under comment b to section 414 if it knew or had reason to know that the means and methods used by subcontractors were unreasonably dangerous and failed to exercise its authority to stop the work or direct that it be performed in a safe manner. As applied here, if the evidence supported the inference that Gilbane knew or had reason to know that temporary tie-ins were being performed by Geary in an unsafe manner or that there were defects in the breakers that could potentially pose a risk of harm to electricians, summary judgment in favor of Gilbane would be improper.

¶ 64     But there is no evidence in the record that gives rise to genuine issues of material fact regarding Gilbane's actual or imputed knowledge. Persin was not, and was not required to be, present on site full time. There is no evidence that he ever personally observed a Geary electrician performing a temporary tie-in or that he should have known that, contrary to Gilbane's safety plan, Geary electricians were not using personal protective equipment when performing that task. See *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 879-80 (2005) ("the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability" (citing Restatement (Second) of Torts § 414 cmt. b, at 387-88 (1965))); *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 347 (2008). Particularly in light of the testimony of Berk and Soltys (who himself had performed tie-ins without using protective equipment or de-energizing the MCC both before and after the accident) that had they observed Gerasi performing the tie-in on December 5, they would not have stopped him or done anything differently, Gilbane's lack of notice dooms Gerasi's section 414 claim. Likewise, there is no evidence that Gilbane had any knowledge of faulty breakers (or any responsibility to inspect, maintain, or repair them) before Gerasi's accident. Thus, at bottom, Gerasi's claim is based on the circumstances that Gilbane did not insist on a procedure for a temporary tie-in that had never before been used and did not warn Gerasi of a dangerous condition that Gilbane did not know or have reason to know existed. In light of the foregoing, summary judgment in favor of Gilbane was proper.

¶ 65     Gerasi's additional argument that the trial court erred in refusing to consider expert testimony not provided to the court until after it ruled in favor of Gilbane is, given our findings above, academic. Because of the absence of any genuine issue of material fact regarding (i) the circumstances of Gerasi's injury, (ii) the lack of any duty on Gilbane's part to personally oversee Geary's work, and (iii) the lack of notice to Gilbane of any hazard associated with either the manner in which temporary tie-ins were performed or the condition of the breakers in the MCC, no expert opinion could have supplied the missing essential elements of Gerasi's claim. In any event, Gerasi's attempt to introduce, via motion for

reconsideration, additional evidence he never claimed was necessary prior to responding to the motion for summary judgment was improper. See *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195 (1989) (court should not permit submission of additional evidence on motion for reconsideration in the absence of an explanation as to why the nonmoving party did not pursue discovery or file an Illinois Supreme Court Rule 191(b) affidavit before the ruling); *Kopley Group V, L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1022 (2007) (trial court did not abuse its discretion in refusing to consider on motion for reconsideration evidence that was not "newly discovered").

¶ 66                                    CONCLUSION

¶ 67    The evidence in the record, viewed in the light most favorable to Gerasi, reveals no genuine issue of material fact regarding Gilbane's breach of duty or any proximate relationship between a breach and Gerasi's injuries. Therefore, the trial court properly granted summary judgment in favor of Gilbane. The trial court further properly refused to consider as "new" evidence deposition testimony that was available at the time of the hearing on Gilbane's motion and deposition testimony taken after the hearing where Gerasi never asserted before the hearing that such evidence was necessary in order to enable him to respond. The orders appealed from are, therefore, affirmed.

¶ 68    Affirmed.

¶ 69    JUSTICE PIERCE, dissenting.

¶ 70    Summary judgment was improperly granted in this case and the plaintiff should be allowed to present to a jury the issue of retained control and the negligent exercise or failure to exercise that control by the general contractor. For the following reasons, I respectfully dissent.

¶ 71    It is axiomatic that summary judgment should be denied where there is a genuine issue of material fact. A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995).

¶ 72    The facts are not in dispute and are relatively straightforward. Gilbane was hired by AT&T as its general contractor to replace large cooling equipment at its building. Gilbane then subcontracted with Geary Electric to perform the electrical work. Plaintiff, an electrician for Geary, was connecting a welder to an energized (hot) electrical breaker when an electrical arc flash explosion occurred, injuring him. Plaintiff was not wearing protective gloves when performing this job.

¶ 73    Recently, our supreme court explained that general contractor direct liability in tort may lie under section 414 of the Restatement (Second) of Torts. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶¶ 37-39. The concept of "retained power of control" as outlined in comment c to section 414 is explained as follows:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations,

- 16 -

which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c, at 388 (1965).

¶ 74 Whether sufficient control was retained to bring the matter within section 414 is typically a question for the trier of fact unless the plaintiff fails to present evidence sufficient to create a question of fact. *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 205 (2005). Generally, the best indicator of whether the general contractor has retained control over an independent contractor's work is the parties' contract. *Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007). When the contract reveals that the general contractor has retained control over safety at a construction site, summary judgment in favor of the general contractor is not appropriate. *Id.* at 75.

¶ 75 Here, at a minimum, the contracts submitted at summary judgment establish a question of fact as to whether Gilbane retained control over Gerasi's work. In my view, that question of fact is answered by the contracts that show Gilbane retained sufficient control to be directly liable for its negligence under section 414 and were sufficient to defeat a summary judgment motion. But, again, it is for the jury to make this determination, not for the court.

¶ 76 By contract with AT&T, Gilbane was charged with full-time supervision of work done by its subcontractors, and it had "full control and supervision over the performance of the [w]ork, and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the work"; it was required to keep the jobsite safe at all times; it was contractually obligated to place "the highest importance and priority on health and safety for the [w]ork performed"; it was "responsible for the safety and protection of the [w]ork, workers of [c]ontractor and [s]ubcontractors, and any other persons or public or private property as required by law and as herein provided"; it was responsible for administering the AT&T/Gilbane safety plan; and it "was responsible for the active control" of the safety plan. Gilbane was tasked with determining whether there was "energized equipment" in the work area "which might have a risk to the worker," and "equipment and conductors that must be de-energized shall be identified by Gilbane who will arrange to de-energize the equipment under the Lockout and Tagging procedure/system." This is clear evidence of general contractor retention of control for direct liability under section 414.

¶ 77 In its contract with Geary, Gilbane retained the right to give orders and instructions to authorized representatives of Geary. A jury could find that this could include the right to give orders and instructions to Gerasi.

¶ 78 Gilbane had a 64-page project safety plan that gave Gilbane "active control" of the job, made Gilbane responsible for "planning and requiring all work to be done in compliance with the Project Safety Plan," and called for "weekly inspections relating to all safety" to be conducted and documented by Gilbane. Specifically referring to energized equipment or electrical circuit in the work area, Gilbane's safety plan provides:

"Contractor shall determine before operations start if there is any *energized equipment* or electrical circuit in the work area, which might have risk to the worker. Equipment and conductors that *must be de-energized shall be identified to Gilbane*

*who arrange to de-energize* the equipment under the Lockout and Tagging procedure/system." (Emphasis added.)

¶ 79    Gilbane's project safety plan further provides that "*electrical tie-ins shall be conducted only on de-energized* (locked out and tagged out) systems. If a condition makes this procedure impossible then a pre-task safety meeting with Gilbane is required. All such 'live work' shall conform to NFPA 70E, most recent edition." (Emphasis added.)

¶ 80    Gilbane does not dispute that these contracts controlled the working relationship between Gilbane and Geary. Even if one were to ignore these contracts, Gilbane removed the question of retained control from our consideration in its summary judgment argument. Gilbane moved for summary judgment by affirmatively arguing that it did not have *notice* that Gerasi was doing the job in an unsafe manner and *that Gilbane exercised its supervisory responsibilities with reasonable care.* In my view, the contracts show, and Gilbane's acknowledgement that it retained control establishes, that there is no issue of Gilbane's retained control. At the very least, Gilbane "retained at least some degree of control over the manner in which the work [was] done," and Geary was "not entirely free to do the work in [its] own way." Restatement (Second) of Torts § 414 cmt. c, at 388 (1965).

¶ 81    As the majority recognizes, in a negligence case, the plaintiff must set forth sufficient evidence that the defendant owed a duty, the duty was breached, and damages were proximately caused by the breach. In this case, the claim is brought by an employee of a subcontractor against a general contractor. As such, Gerasi must present evidence that Gilbane owed him a duty of care. Section 414 provides that where the general contractor retains control over the work site, it may be directly liable for an injury to an employee of its subcontractor if (a) the general contractor retained sufficient control over the project and (b) the general contractor is either negligent in exercising that retained control or fails to exercise that control. Notice to the general contractor that the plaintiff or his supervisor or his employer is doing, or in the past has done or immediately after the accident continues to do, the job in the same negligent manner is not the question. The focus should be on general contractor control and what the general contractor did or should have done in the exercise of that control as it relates to the injury.

¶ 82    Here, for purposes of summary judgment, the issue of general contractor retention of control, in my judgment, was sufficiently admitted by Gilbane in the circuit court (and acknowledged by the majority but characterized as "not *** dispositive" (*supra* ¶ 48)). If one were to quibble, if Gilbane did not admit retained control in the circuit court, Gilbane all but conceded retained control at oral argument. In addition to basing its summary judgment motion on the admission that it exercised its control with reasonable care, Tom Persin, Gilbane's project representative, testified that Gilbane had general responsibility for job safety. Persin was supposed to approve electrical tie-ins, but for convenience, he and Geary decided to allow Geary to perform tie-ins without his approval. Persin was not aware that Geary was performing tie-ins without personal protection equipment until after the accident when Geary requested personal protection equipment as a precaution in an MOP. This act of convenience may impress a jury that it is evidence of negligence.

¶ 83    With retained control having been sufficiently established at the summary judgment phase, the next issue of section 414 liability is whether the general contractor was negligent in the exercise of, or negligently failed to exercise, that retained control. That question is not answered by merely considering and accepting the "evidence" offered by the defendant.

- 18 -

Here, as in most contested injury cases, the plaintiff presented expert testimony focused on Gilbane's negligent acts or omissions and the defendant, not surprisingly, asserted that it was not negligent.

¶ 84    A contractor's knowledge of unsafe conditions or inadequate equipment can be a sufficient basis to find direct liability for failure to exercise general supervisory control with reasonable care, where the contractor took no steps to stop the work or otherwise remedy the situation. *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 879 (2005). Gerasi presented sufficient evidence to establish a disputed issue of fact as to Gilbane's acts or failure to act, which should be resolved by a jury.

¶ 85    Gerasi was injured when he put his hands in a live electrical box without using protective gloves. He claims Gilbane retained control over the worksite and this control included a duty to provide a safe work place that would not allow for someone to stick their unprotected limb into a live electrical box. Gilbane agreed at summary judgment (and in my judgment at oral argument) that it had *control* over the worksite but that it had no *notice* of how Gerasi was doing his job. The circuit court agreed and granted summary judgment in favor of Gilbane on the basis that Gilbane did not have *notice* of what Gerasi was doing. This is not a "slip and fall case" where notice may be relevant. Notice in the context of this case is not required to prove negligence. This was error.

¶ 86    Under section 414, notice is not the question. Control and the exercise or failure to exercise that control are the questions. "One who entrusts work to an independent contractor [(Gilbane)], but who retains control of any part of the work, is subject to liability for physical harm to others [(Gerasi)] for whose safety the employer [(Gilbane)] owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414, at 387 (1965).

¶ 87    The majority agrees with that principle but spins in a different direction to find that, although Gilbane retained sufficient section 414 control over the work place, it did not *know* what Gerasi was doing before or at the time of his injury, and in any event, Gerasi's boss (Soltys) and employer (Berk) did not think it was unsafe to do what Gerasi did. But the opinions of his employer and his boss were offered on defendant's behalf. If that was the only evidence before the circuit court then summary judgment might be appropriate. But the majority's conclusion ignores the evidence submitted by the plaintiff on the issue of Gilbane's breach of duty.

¶ 88    In its analysis, the majority states that, unlike cases where retained control was sufficiently at issue, and because retained control was not the focus of the circuit court's ruling, "we will assume, without deciding, for [the] purposes of our remaining analysis, that Gilbane retained control sufficient to trigger potential liability under section 414." *Supra* ¶ 52. In my view, the majority assumes the retention of control because my esteemed colleagues cannot refute that this record is sufficient to defeat summary judgment on the control issue. Assuming retained control, the majority claims that Gerasi is reading comment b out of section 414 because Gerasi must still prove "Gilbane was negligent in the manner in which it exercised its retained control" but then critically fails to acknowledge that *the failure to exercise* retained control can also lead to liability. *Supra* ¶ 55.

¶ 89    Plaintiff submitted the testimony of safety expert, Frank Burg, who opined on the negligence and causation issues of plaintiff's accident. Burg opined that "the practice of AT&T and Gilbane allowing electricians to work in MCC's or similar cabinets with live

- 19 -

electrical equipment without full and proper personal protective equipment and without allowing lockout and tagout of the equipment, invites injury to the electrician." He opined that Gilbane was negligent in exposing an electrician to such risk and Gilbane's negligence proximately caused plaintiff's injuries. Burg further opined that Gilbane violated OSHA standards and went against the industry customs and practices by not preplanning. He stated that even if the load side was de-energized, it would have been safer for the entire system to be de-energized rather than keeping one side live. He stated that plaintiff's accident could have been avoided if he was wearing personal protection equipment.

¶ 90 Burg stated that Gilbane was required to have rules, to make sure that the rules were communicated to the subcontractors, to observe the job to make sure that the rules were followed, and take action if the rules were not followed. In his opinion, Gilbane had a duty to insist that the safety protocols contained in the MOPs, including de-energizing equipment, were followed and that Gilbane did not enforce the rules of the project.

¶ 91 Burg's opinion testimony, whether accepted by the majority or not, established a genuine issue of material fact of whether Gilbane reasonably exercised or failed to exercise its admitted retained control. Further, Burg's expert testimony was not the only evidence provided by plaintiff to defeat summary judgment. Plaintiff offered an electrical expert, Brian Vandal, who also opined that Gilbane should have followed the established job safety protocols. He also opined that Gilbane should have determined whether the system could have been de-energized and Gilbane had a duty to ensure the equipment presented no safety risks. He opined that it was possible to schedule the work for a time of day when the MCC could have been de-energized without disruption and that Gilbane's failure to do so was negligent. These failures to exercise its retained control are sufficient for a jury to decide whether liability under section 414 exists.

¶ 92 Also, plaintiff submitted the testimony of Chuck Berthold. He tested the equipment postaccident and testified that the breaker had an internal "short" which would not have been revealed with a visual inspection. This is additional evidence worthy of a jury's consideration.

¶ 93 The majority agrees that under section 414, Gilbane must have retained control over the manner of work (*supra* ¶¶ 46, 47). The majority also agrees that under section 414, Gilbane must have acted or failed to act and the act or failure to act "was negligent in the manner in which it exercised, *or failed to exercise*, its retained control." (Emphasis added.) *Supra* ¶¶ 46, 47. Plaintiff offered evidence through Burg, Vandal, and Berthold of *the failure to exercise* the control Gilbane agrees or concedes that it retained. This is clearly sufficient to defeat summary judgment.

¶ 94 The majority quotes comment b of section 414 that allows for Gilbane's direct liability "if it fails to prevent [Gerasi] from doing even the details of the work in a way unreasonably dangerous to others, if [it] knows *or by the exercise of reasonable care should know* that [Gerasi's] work is being so done, and has the opportunity to prevent it by exercising the power of control which [it] has retained." (Emphasis added and internal quotation marks omitted.) *Supra* ¶ 45. It is confounding that the majority fails to recognize the "should know" portion of comment b and instead emphasizes the "fact" that Gilbane *did not know* what Gerasi was doing. *Supra* ¶ 64. For summary judgment purposes, it does not matter that Persin did not know or "personally observe[ ]" Geary's electricians at work or "that, contrary to Gilbane's safety plan, Geary electricians were not using personal protective equipment when

performing that task." *Supra* ¶ 64. A jury should decide whether Gilbane knew or should have known these facts. A jury should decide whether Gilbane should have known what Gerasi did or what Gerasi was going to do failed to comply with Gilbane's established safety plan. The majority result makes sense only if one completely ignores the evidence of Burg, Vandal, and Berthold and the "should have known" language in comment b.

¶ 95    The finding that there is no evidence that inspection, maintenance, or replacement of electrical equipment was within the scope of Gilbane's agreement with AT&T is the majority's conclusion. *Supra* ¶ 57. It is not my conclusion. It may or may not be a jury's conclusion. But it is the jury's decision to make, not the reviewing court. By contract with AT&T, Gilbane was charged with full-time supervision of work done by its subcontractors, and it had "full control and supervision over the performance of the [w]ork, and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the work"; it was required to keep the jobsite safe at all times; it was contractually obligated to place "the highest importance and priority on health and safety for the [w]ork performed"; it was "responsible for the safety and protection of the [w]ork, workers of [c]ontractor and [s]ubcontractors, and any other persons or public or private property as required by law and as herein provided"; it was responsible for administering the AT&T/Gilbane safety plan; and it "was responsible for the active control" of the safety plan. Gilbane was tasked with determining whether there was "energized equipment" in the work area "which might have a risk to the worker," and "equipment and conductors that must be de-energized shall be identified by Gilbane who will arrange to de-energize the equipment under the Lockout and Tagging procedure/system." A jury should be allowed to consider this wealth of evidence and decide Gilbane's section 414 direct liability.

¶ 96    In rejecting Gerasi's argument that Gilbane "abandoned" its safety obligations, the majority states Gilbane had no authority to identify power sources or identify a tie-in source, concluding it was simply a "coordinator." *Supra* ¶ 59. Again, this is a conclusion of the majority and one that a jury might differ with after reviewing the same contractual obligations referred to in the preceding paragraph of this dissent. And to find as a matter of law that Persin's decision to remove himself (Gilbane) from the authorization process was not negligent is classic fact finding by a court reviewing a factual issue on summary judgment. This, again, is a fact determination that a reasonable jury should decide, not a court of review.

¶ 97    The question in this case is not whether Gilbane had authority to allow or override tie-ins. *Supra* ¶ 59. The issue is: was Gilbane negligent in allowing or failing to stop Gerasi from performing the tie-in in an unsafe manner not whether to do a tie-in. And, if Geary failed to follow established MOPs (*supra* ¶ 59), a reasonable jury could find Gilbane should have insisted that Geary follow the MOP and a failure to insist on compliance was negligent. Gerasi does not contend that the entire project should have been de-energized. *Supra* ¶ 61. The complaint clearly alleges that, whatever work was done by Gerasi, Gilbane, under its contract with AT&T, had the duty to place "the highest importance and priority on health and safety for the [w]ork performed" "for the safety and protection of the [w]ork, [and] workers of [c]ontractor and [s]ubcontractors," "as required by law and as herein provided;" it was responsible for administering the AT&T/Gilbane safety plan, and it "was responsible for the active control" of the safety plan. Gilbane was tasked with determining whether there was "energized equipment" in the work area "which might have a risk to the worker," and

"equipment and conductors that must be de-energized shall be identified by Gilbane who will arrange to de-energize the equipment under the Lockout and Tagging procedure/system."

¶ 98      The finding that "Gilbane's lack of notice dooms Gerasi's section 414 claim" (*supra* ¶ 64) is also perplexing in the face of the clear, unambiguous guidance of comment b. The majority's acknowledgment that Gilbane could be liable under comment b "if it knew *or had reason to know* that the means and methods used by [Gerasi] were unreasonably dangerous and failed to exercise its authority to stop the work or direct that it be performed in a safe manner" (emphasis added) (*supra* ¶ 63) should result in a reversal of the grant of summary judgment in favor of Gilbane. Plaintiff's experts, and the essentially admitted facts of the accident (putting an unprotected hand into a live electrical box), at a minimum establish a question of fact that defendant should have known that what Gerasi had previously done (put his unprotected limbs in a hot electrical box) and did do (resulting in his injury), and what his employer did a day or two after the incident, was "unreasonably dangerous" (according to plaintiff's experts) and should have and could have been stopped and directed to be performed in a safe manner.

¶ 99      Here, there is certainly a question of material fact as to whether Gilbane should have known that plaintiff was performing electrical tie-ins without proper personal protective equipment. The evidence shows that Gilbane knew or should have known that Geary would be working on a partially energized system because of AT&T's requirement that the system could not be shut down and that contract requirements would necessarily require performing live tie-ins. Before plaintiff's accident, Persin knew that Geary performed electrical tie-ins for other trades on the project. If Persin knew this, he should have known Gerasi was doing this without proper protection. Plaintiff's experts opined that working on a partially energized system was dangerous and presented safety risks and that safety equipment was necessary. To find that there was no evidence that Persin should have known the electricians were not using protective equipment around live electrical boxes resurrects the ostrich defense. *Supra* ¶ 63. This finding by the majority will provide general contractors with an arguable defense to every section 414 claim that they are not liable under section 414 even though they retained control, turned everything over to their subcontractor, and relied on the subcontractor to adhere to the safety plan they were contractually obligated to perform but chose to ignore for the sake of convenience.

¶ 100     A contractor's knowledge of unsafe conditions or inadequate equipment can be a sufficient basis to find direct liability for failure to exercise general supervisory control with reasonable care when the contractor took no steps to stop the work or otherwise remedy the situation. *Cochran*, 358 Ill. App. 3d at 879 (2005). Here, there is evidence that Persin knew, at the very least, that Geary was performing electrical tie-ins on a partially energized system.[2] Although Persin testified that he did not know that Geary was performing tie-ins on partially energized breakers without personal protective equipment, because of Gilbane's retained control over the worksite, there exists a question of fact of whether Gilbane should have

---

[2]The parties do not agree on whether the electrical system should be classified as "energized." Defendant argues that the system plaintiff was working on at that time was not live, that the portion of the breaker that Geary was working on was not energized. Defendant then argues that even if it could be considered energized, performing tie-ins on energized breakers is a customary and safe practice.

known that plaintiff was performing unsafe electrical tie-ins either before or at the time of plaintiff's injury.

¶ 101    I would reverse the order of the trial court and remand to allow a jury to decide this case.